7 F.3d 1046
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Wallie A. SCOTT, Defendant-Appellant.
 No. 92-6272.
 United States Court of Appeals, Tenth Circuit.
 Oct. 8, 1993.
 
 Before BRORBY, SETH and HOLLOWAY, Circuit Judges.
 ORDER AND JUDGMENT*
 HOLLOWAY, Circuit Judge.
 
 
 1
 Wallie A. Scott appeals from his convictions for conspiracy to possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1). We affirm.
 
 
 2
 * In the summer of 1989, Elzie Hooks, a man facing state criminal drug charges, offered to assist Oklahoma City police in a drug investigation. Hooks agreed to try to buy cocaine from a man whose street name was "Y.C.," whom Hooks identified at trial as Scott. IV R. 280-81. Hooks testified that he had previously been involved in five or six or perhaps seven or eight drug deals with Scott in a two-month period before July 14, 1989. These were deals in crack cocaine involving at least a half-ounce or more. Id. at 329-30.
 
 
 3
 With Hooks working as a confidential informant, the investigation began on the evening of July 14, 1989. Id. at 279. The government's evidence at trial was that Hooks, under police supervision, arranged two meetings with Scott during the evening, and after each turned over to police officers packages containing cocaine that he testified he bought from Scott. Id. at 289-91, 313-318. Trial evidence showed that Hooks gave the police packages obtained from the two buys containing some 2.7 grams of cocaine base. Following the second meeting between Hooks and Scott, police pursued Scott's vehicle. There was evidence that during the pursuit Scott tossed out of the car a cup and several plastic bags containing cocaine base near a street median. These items were recovered and offered in evidence. Eventually police arrested Scott after he abandoned the car. At trial Scott claimed he had been buying cocaine from Hooks.
 
 
 4
 Scott and Verdell Allen Krauter were named in a two-count indictment filed in the Western District of Oklahoma on August 23, 1989. In count one, Scott was charged with conspiring with Krauter and other unknown persons to possess, with intent to distribute, approximately 150 grams of cocaine base in violation of 21 U.S.C. § 846. Count two charged Scott with possession with intent to distribute 150 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1). Krauter was not convicted on either count and is not a party to this appeal.
 
 
 5
 Following trial in October 1989, a jury found Scott guilty on both counts of the indictment. Scott was sentenced initially on December 18, 1989, to serve 240 months' imprisonment, to be followed by five years of supervised release on each count, to run concurrently. I R.Doc. 39.
 
 
 6
 Following sentencing, Scott's retained counsel did not file a notice of appeal. Scott, proceeding pro se, filed a post-conviction motion to vacate, set aside, or correct the sentence, noting the failure of his counsel to file a notice of appeal. On June 17, 1992, the district judge entered an order granting Scott's motion to vacate the sentence and scheduled a resentencing. I R.Doc. 58. In addition, the judge appointed counsel to represent Scott at the resentencing. At the resentencing in July 1992 the judge imposed the same sentence he previously had given Scott. Scott appeals from the convictions and sentences entered upon resentencing.
 
 II
 
 7
 Scott first argues he is entitled to a new trial as a result of a discovery violation by the government. During the government's cross-examination of a defense witness, the trial judge permitted questioning and admitted testimony about an exhibit which the government had not disclosed to the defense prior to trial pursuant to Rule 16(a)(1) of the Federal Rules of Criminal Procedure.
 
 
 8
 As a starting point in our analysis, we note that even if a discovery violation occurred, the question whether sanctions under Rule 16(d)(2), including the exclusion of testimony and the exhibit, were appropriate was a matter committed to the trial judge's sound discretion. United States v. Fernandez, 780 F.2d 1573, 1576 (11th Cir.1986) (per curiam). Thus we review the trial judge's decision to admit evidence concerning the undisclosed exhibit for an abuse of discretion. Id.
 
 
 9
 During the cross-examination of Tina Wiley, Scott's wife, a prosecutor asked Wiley whether Scott had sent money to her in California while he was in Oklahoma City just prior to his arrest. Initially, Wiley denied in general that Scott had sent money to her from Oklahoma and also denied specifically that he had sent money to her through Western Union. VI R. 704. At that point the prosecutor asked Scott's wife whether Scott had not sent her $1,000 on July 14, 1989, through Western Union. Scott's counsel stated that he objected and requested a bench conference, which was granted. During this conference a Rule 16 objection was made by Scott's counsel, who stated that they had "not been provided with a copy of [the transfer receipt] pursuant to discovery." Id. at 705. At the conclusion of the bench conference the trial judge agreed with the government counsel that questioning about the receipt was appropriate because the exhibit appeared to be a strict contradiction of the testimony of Scott's wife that he had not sent her any money. Under the circumstances the judge said the questioning was appropriate, thus overruling the objection. Id. at 707-08.
 
 
 10
 Scott says there are three reasons why there was a Rule 16(a)(1) violation by the government. First, Scott argues that the Western Union receipt was subject to disclosure under Rule 16(a)(1)(A) as a written statement. The relevant portion of the rule provides:
 
 
 11
 Upon request of a defendant the government shall disclose to the defendant and make available for inspection, copying, or photographing: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government....
 
 
 12
 Fed.R.Crim.P. 16(a)(1)(A) (emphasis added).
 
 
 13
 Scott argues that the receipt was a written "statement" within the rule because the government attempted to show that Scott had written or signed it. The Western Union receipt bore a handwritten signature of the name "Tony Scott." VI R. 773. Questioned by a prosecutor about the signature, Scott testified that he had never seen the receipt and that he had not signed it. Id. at 772-73. Scott testified that he had told the woman who sent the money to his wife to sign the name "Tony Scott"--his school nickname--to the receipt. Id. at 774.
 
 
 14
 In view of Scott's unchallenged testimony that he did not sign the receipt, and that he only had a friend send the money and sign his nickname, we agree with the government that the exhibit was not a statement made by the defendant within the meaning of Rule 16(a)(1)(A).
 
 
 15
 The defendant argues further that the exhibit was discoverable as a paper in the government's possession which was "material to the preparation of the defendant's defense...." Rule 16(a)(1)(C).
 
 
 16
 In order to satisfy this materiality requirement, a defendant must demonstrate "some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." United States v. Ross, 511 F.2d 757, 763 (5th Cir.), cert. denied, 423 U.S. 836 (1975). We are not convinced that having the receipt in advance could have significantly aided the defense in preparation for the cross-examination of the defense witnesses or in the presentation of any defense evidence. Accordingly, this theory of a prejudicial disclosure violation fails.
 
 
 17
 In any event, in a case of a claim of such error under Rule 16 we have held that "errors will not require reversal of a conviction absent a showing that defendant was deprived of substantial rights." United States v. Jensen, 608 F.2d 1349, 1357 (10th Cir.1979). We are not persuaded here that permitting questioning about the transfer order or its admission in evidence had any substantial influence on the verdict in light of the strong evidence of Scott's guilt.
 
 III
 
 18
 Scott next argues that the evidence was insufficient to support the jury's verdict of guilt on both counts of the indictment. At trial Scott's counsel made a motion for a judgment of acquittal pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure at both the close of the government's case in chief and at the close of the defense case. Both motions were denied.
 
 
 19
 In reviewing the denial of a motion for a judgment of acquittal, we consider all the evidence, both direct and circumstantial, and the reasonable inferences from that evidence in a light most favorable to the government. United States v. Troutman, 814 F.2d 1428, 1455 (10th Cir.1987). The evidence will be considered sufficient if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).
 
 
 20
 * Scott first challenges the sufficiency of the evidence on count one. In order to sustain the conviction on the conspiracy count, the government was required to establish that "two or more persons agreed to violate the law, that the defendant knew at least the essential objectives of the conspiracy, and that the defendant knowingly and voluntarily became part of it." United States v. Fox, 902 F.2d 1508, 1514 (10th Cir.), cert. denied, 498 U.S. 874 (1990); see also, e.g., United States v. Williams, 923 F.2d 1397, 1402 (10th Cir.1990), cert. denied, 111 S.Ct. 2033 (1991). We conclude that based on the trial evidence the jury reasonably could have found the essential elements of conspiracy.
 
 
 21
 The government's evidence at trial was that the police initially planned to observe, as well as to monitor with a wireless microphone, the transactions between confidential informant Hooks and defendant Scott. The officers observed Hooks making arrangements for the first of the two controlled buys, but they were unable to hear much of the conversation during the first transaction because Hooks' microphone malfunctioned. III R. 26-27. Then the police officers lost Hooks in traffic and arrived in the area of the transaction after Hooks' meeting with Scott. Id. at 29. However, immediately after the meeting, Hooks reported to police that he had been able to purchase two grams of cocaine from Scott. Id. at 26; IV R. 287. Hooks turned over to them the drugs he said he had purchased from Scott. Id. at 292; III R. 29.
 
 
 22
 Police then made arrangements with Hooks to attempt another drug buy during the same evening. III R.30-31. Although Hooks and Scott agreed to meet again, the first attempted meeting did not occur, apparently because a police car drove through the area of the planned meeting at the prearranged time. IV R. 295-96. As a result, Hooks, with police approval, tried again to arrange a controlled buy. III R. 31-32; IV R. 298-99.
 
 
 23
 Hooks testified that Scott agreed to another meeting. As Hooks waited at the prearranged location, Scott passed by in a black-over-tan Oldsmobile and motioned to Hooks to follow. Id. at 288-89. While following Scott's car, Hooks said he noticed a gold car driven by Krauter behind him. Hooks said he lost sight of Scott's car in traffic and decided to follow Krauter's car in order to find Scott. Id. at 300-03.
 
 
 24
 While following Krauter's car, Hooks said he became concerned that the drug buy with Scott might be in jeopardy because he saw someone in a nearby car, a black sports car, who he thought might be a police officer. Id. at 305. Hooks said he pulled alongside Krauter's car and inquired about the car he suspected might be a police vehicle. Id. Hooks said Krauter "basically ... said that it's nothing, be cool, and says ...' [m]y people are back there,' " and motioned behind him with his hand. Id. at 306.
 
 
 25
 Hooks said Krauter then turned his car around and drove "towards where he said his people were at," and that he followed Krauter. Id. at 307. Along the same street on which he had spoken to Krauter, Hooks said he saw a car and "figured ... that was the car." Id. Hooks said Krauter parked his car in front of Scott's black and tan Oldsmobile and that he, Hooks, parked behind Scott's car. Id. at 307-08. Hooks said he then climbed into the right-hand side of the back seat of Scott's Oldsmobile. Scott was sitting on the passenger side of the front seat. Id. at 308. Hooks said that about the same time he climbed into the Oldsmobile, Krauter leaned in the window and talked with Scott. Id. at 308-09.
 
 
 26
 Once in the car with Scott, Hooks said he observed Scott hand cocaine to a woman who was sitting in the back seat. Id. at 310. Hooks estimated that the woman bought approximately 1 1/2 ounces of cocaine. Id. at 311. After the woman got out of the car, Hooks said he made his purchase. Hooks said he handed $100 to Scott, and in return Scott handed him a plastic bag, which Hooks believed contained approximately two grams of cocaine. Id. at 313. Hooks returned to his car, and all three cars drove away. Id. at 314, 315.
 
 
 27
 At a stoplight, police observed the driver of the black and tan Oldsmobile get out of the car. They saw the passenger, Scott, move into the driver's seat and continue driving the car. Police said they next observed the driver, later found to be Scott, throw something from the car. Scott stopped the car in the road, and started running; he was captured and arrested. Officer Evans retrieved the items they had seen Scott throw from the car, including a cup and several plastic bags of suspected cocaine. III R. 53-54.
 
 
 28
 Defendant Scott testified in his own defense. He denied having ever bought any drugs from Hooks and specifically denied buying drugs from Hooks on 21st Street for $100. V R. 753. Scott said he did not have the drugs, which were left in his car, with the intent of distributing it to someone else to make money off of it. Id. at 754. And Scott denied that he had conspired with his brother to sell any drugs or to possess it or distribute it to anybody. He said his brother, Krauter, didn't even know that he had it. Id. at 754.
 
 
 29
 Scott explained that some girls he had met told him where to buy cocaine, id. at 731; when he went there, a heavyset woman had gotten in his car in the back seat with a cup in her hand and Hooks also got in; the woman and Hooks had exchanged a few words that Scott could not recall; then the woman got out and Scott purchased cocaine for $100 from Hooks. Id. at 737-38. Hooks got out and left and then another man, Reed, was driving. Scott saw that the cup had been left in the back seat with money and coke in it; Scott stuck the money in his pocket. Id. at 742. At a stoplight Reed exited the car, leaving Scott behind. Id. at 744. Scott threw the cup and drugs out of the car so that people following him would leave him alone. Scott drove on a short distance and then jumped out of the car, ran and hid in some bushes, where he was apprehended by Officer Danner. Id. at 748-49.
 
 
 30
 Scott argues that the government's evidence did not show an agreement by Scott with others so as to support his conspiracy conviction. We disagree. From Hooks' testimony the jury could reasonably infer that Scott was assisted by and working with Krauter. This was sufficiently indicated by the testimony outlined earlier about the second controlled buy on the evening of July 14 (i.e., the actions of Krauter in telling Hooks to "be cool" because Krauter's people were "back there," and Krauter's leaning in Scott's car window and talking with Scott before Scott's sale of cocaine to Hooks). Moreover, it was amply shown that Scott was selling cocaine at about the time of these actions where Krauter was involved. We feel the proof was sufficient for the jury to find that Scott was one of two persons who agreed to violate the law, that Scott knew at least the essential objectives of the conspiracy, and that he knowingly and voluntarily became a part of it. See United States v. Fox, 902 F.2d at 1514.[1]
 
 
 31
 Scott also contends that the proof on count two, possession with intent to distribute, was defective in that Hooks' testimony was uncorroborated. We are not persuaded. There was ample testimony from Hooks and others about the overall sequence of events and Scott's actions in throwing out the cocaine and the cup in the final chase after the second buy. There was certainly more evidence against Scott than a showing of mere presence at the scene of criminal conduct.
 
 
 32
 We hold the proof was sufficient to support the convictions of Scott on both counts.
 
 IV
 
 33
 Finally, Scott challenges the quantity of "crack" cocaine used to compute his sentence. The Presentence Report fixed the quantity of "crack" cocaine involved in the case at 167.1 grams, II R. para. 14, a figure which the judge adopted, I Supp.R.Doc. 76, at 4. Under the Sentencing Guidelines, that quantity established a base offense level of 34. See United States Sentencing Comm'n, Guidelines Manual § 2D1.1(a)(3), (c)(5) (Nov.1992) [hereinafter U.S.S.G.]. To the base offense level the judge added two offense levels upon finding that Scott had obstructed justice by giving untruthful testimony at trial, resulting in a total offense level of 36. I Supp.R.Doc. 76, at 5; see also U.S.S.G. § 3C1.1. Based upon Scott's criminal history category of II, the sentencing range was 210 to 262 months. The judge sentenced Scott within that range to 240 months' imprisonment. Of the various components of the sentence, Scott challenges on appeal only the judge's finding of drug quantity.
 
 
 34
 The drug quantity figure used in calculating Scott's sentence was based on the trial testimony of Mr. Dawes, a forensic chemist in the Oklahoma City Police Department. V R. 475. Dawes testified that chemical tests were performed on two packages (Government Exhibits 1-A and 1-B) extracted from Government Exhibit 1. V R. 478-79. Officer Evans had identified these as bags containing rock cocaine obtained in the two buys from Scott. III R. 61. Evans identified the contents of "Government Exhibit Number Two" as 14 plastic bags containing various amounts of rock cocaine with a gross weight of 173.6 grams; these were the items of contraband found in the median area. III R. 56-57.
 
 
 35
 Dawes said the total weight of the substances attributed to the two controlled buys was 2.7 grams. Id. at 479-481. In addition, Dawes testified about the 14 plastic bags in Government Exhibit 2-A, consisting of 12 plastic bags and two Ziploc bags. V R. 483. Dawes said that the total weight of the substance in all 14 plastic bags was approximately 164.4 grams. Id. at 483. Thus the total drug quantity figure used in the selection of the base offense level of 34--167.1 grams--was the sum of the approximate weights of the substances obtained in the controlled buys (2.7 grams) and from the 14 plastic bags (164.4 grams) found after the arrests.[2]
 
 
 36
 In addition to determining the weights of the seized substances, Dawes analyzed the substances attributed to each of the two controlled buys, and concluded that each contained cocaine in free base or base form. Id. at 480. Dawes did not, however, analyze the substances in all of the 14 plastic bags. Dawes tested the contents of just four of the 12 plastic bags and concluded that each contained cocaine in the base form. Id. at 483-84. The chemist also tested the contents of one of the two Ziploc bags, and concluded that it contained cocaine in base form. Id. at 484.
 
 
 37
 Scott challenges the drug quantity figure used as the basis of the base offense level because Dawes did not perform a chemical analysis on the contents of all of the 14 plastic bags picked up by the officers after the chase ended. Scott argues that the base offense level should have been based on the total weight of just the packages which Dawes analyzed, including the four plain plastic bags and the one Ziploc bag tested. The district court rejected this argument at the sentencing hearing. I Supp.R.Doc. 76, at 4-5.
 
 
 38
 A district court's determination of the quantity of drugs involved in a defendant's conduct for sentencing under the Guidelines is a factual finding that we review for clear error. United States v. Molina-Cuartas, 952 F.2d 345, 348 (10th Cir.1991), cert. denied, 112 S.Ct. 1698 (1992); United States v. Padilla, 947 F.2d 893, 896 (10th Cir.1991). To make this finding, a judge must determine by a preponderance of the evidence the quantity of the drugs involved. Molina-Cuartas, 952 F.2d at 348. Here the forensic chemist did not state an opinion about the chemical contents of the untested items. V R. 485. However, we conclude the judge's finding of drug quantity was based on a preponderance of the evidence.
 
 
 39
 The evidence showed that the two controlled buys and Scott's arrest occurred within a relatively short period of time in one evening. The confidential informant, Hooks, testified that he purchased cocaine twice from Scott. The first time Hooks testified that Scott got the cocaine for Hooks by digging it out of a large cup of cocaine. IV R. 290. Hooks also said that when the second transaction was consummated, he saw the same cup in the car. Id. at 317. Scott, when pursued by police, threw out a large plastic cup and several packages containing a white substance, later identified as crack cocaine. III R. 49-50. The evidence, then, supported the inference that all of the seized substances had come from the same drug cache in Scott's possession.
 
 
 40
 In order to be included in a judge's calculation of drug quantity, substances do not necessarily have to be identified as drugs through direct evidence of chemical analysis of all of the controlled substance used for sentencing purposes. See United States v. Brett, 872 F.2d 1365, 1372 (8th Cir.) (upholding drug quantity finding based upon random sampling), cert. denied, 493 U.S. 932 (1989). Here the chemist's testimony was that the substances attributed to Scott in the two controlled buys were tested and were cocaine base; further, the chemist testified that he analyzed the substance in four of the 12 plastic bags and one of two Ziploc bags remaining, randomly selected, and found they contained cocaine base. V R. 480-484. In view of the chemist's testimony and the evidence about the defendant's handling of the substances, and their recovery, we believe the judge reasonably could have found that all of the substances in question were cocaine base.
 
 
 41
 Other trial evidence also supported an inference that the untested substances contained cocaine. For example, the chemist testified that the substances in the plastic packages which he did not test had the same appearance and consistency as the substances he tested. V R. 484. In sum, we hold that the testimony about the results of the chemist's random testing of the seized substances, as well as the other evidence about the untested substances, was sufficient to support the district judge's factual finding of drug quantity.
 
 V
 
 42
 No reversible error having been demonstrated, the judgment and sentence are AFFIRMED.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 We are mindful that our opinion relies on the evidence relating to the co-defendant Krauter, whom the jury did not convict on the conspiracy count. Instead the jury was unable to reach a verdict on that count as to Krauter and a mistrial was declared as to him. I R., Criminal Docket Sheet, Item 21. We have held, however, that such a failure by the jury to reach a verdict on a conspiracy charge as to a co-conspirator is a "nonevent that in no way affects [the instant defendant's] conviction for conspiracy." United States v. Sasser, 974 F.2d 1544, 1560 (10th Cir.1992), cert. denied, 113 S.Ct. 1063 (1993)
 
 
 [2]
 Dawes explained in detail during his trial testimony his procedure in weighing, analyzing, and approximating the weight of the substance in the packages. The exhibit numbers are somewhat confusing but they work out consistently with his conclusions as to weights
 Dawes said that he first analyzed the substance in Exhibits 1-A and 1-B (that from the controlled buys): "The first thing I did was, basically, determine how much was there, what the weight of the sample was." V R. 479 (emphasis added). He took a small part of the sample and performed his tests on it. Id. at 479-80. As to the 14 packages extracted from Government Exhibit 2, an evidence envelope, Dawes was asked "what was the-- the weight of the substance that you have there in Government's Exhibits 2-A?" He replied: "The total weight of all 14 bags was approximately 164.4 grams." Id. at 483 (emphasis added).
 We are satisfied that the testimony supports the weight as stated in the Presentence Report--167.1 grams of crack cocaine--making the base offense level 34. II R. at p 14. The judge accepted the PSR on this matter. See VII R. 4-5; I Supp.R. 4.