Volume 1 of 2

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

v.

CARLOS DAVID CARO,

        *Defendant-Appellant.*

No. 07-5

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
James P. Jones, Chief District Judge.
(1:06-cr-00001-JPJ)

Argued: October 30, 2009

Decided: March 17, 2010

Before GREGORY, SHEDD, and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the majority opinion, in which Judge Shedd concurred. Judge Gregory wrote a dissenting opinion.

## COUNSEL

**ARGUED**: Denise Charlotte Barrett, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for

Appellant. David E. Hollar, UNITED STATES DEPART-
MENT OF JUSTICE, Washington, D.C., for Appellee. **ON
BRIEF:** Sarah S. Gannett, Assistant Federal Public Defender,
FEDERAL COMMUNITY DEFENDER'S OFFICE, Phila-
delphia, Pennsylvania, for Appellant. Julia Campbell Dudley,
United States Attorney, Anthony P. Giorno, Assistant United
States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Roanoke, Virginia, for Appellee.

---

**OPINION**

DUNCAN, Circuit Judge:

This appeal arises from a death sentence imposed under the
Federal Death Penalty Act (the "FDPA"), 18 U.S.C. §§ 3591-
98, following a conviction for murder in violation of 18
U.S.C. § 1111. Appellant Carlos David Caro challenges the
district court's voir dire; denial of motions under *Brady v.
Maryland*, 373 U.S. 83 (1963), and Federal Rules of Criminal
Procedure 16(a)(1)(E) and 17(c); refusal to give Caro's pro-
posed mercy instruction; and various decisions concerning
admissibility. Caro also argues that the jury instruction and
government's argument about lack of remorse violated his
Fifth Amendment privilege against self-incrimination, that the
government's closing argument violated the Due Process
Clause, and that 18 U.S.C. § 3592(c)(10) and (12) violate the
Eighth Amendment. For the reasons stated below, we affirm.

## I.    Background

At about 6:40 p.m. on December 17, 2003, a prison guard
discovered inmate Roberto Sandoval strangled to death inside
his cell in the Special Housing Unit (the "SHU") at United
States Penitentiary Lee ("USP Lee") in Jonesville, Virginia.
He lay dead with a towel knotted around his neck. His cell-
mate Caro had been the only other person inside the locked

cell. Caro later explained, "[Sandoval] called me mother fucker, that whore, that's why I fucked him up." J.A. 781.

### A.

Caro comes from a poor neighborhood in Falfurrias, Texas, where he lived with his siblings and an abusive, alcoholic father. While still young, Caro began helping his uncles transport illegal drugs into the United States. He was later convicted of possession of marijuana with intent to distribute in April 1988, conspiracy to possess over one hundred kilograms of marijuana with intent to distribute in January 1994, and possession of cocaine with intent to distribute in November 2001.[1] Following his third conviction, Caro was sentenced to thirty years imprisonment.

In prison, Caro became a leader in the Texas Syndicate, a violent prison gang. In that role, Caro was involved in two violent incidents prior to Sandoval's murder. In the summer of 2002 at Federal Correctional Institute Oakdale ("FCI Oakdale"), a prison official asked Caro to maintain the peace because members of another gang were scheduled to arrive. Caro responded that "the Texas Syndicate were going to do what they had to do." J.A. 908. Soon after, Caro and fellow Texas Syndicate members violently attacked the new arrivals. Taking responsibility, Caro commented: "I don't give a fuck if they send me to the United States Penitentiary. My brothers follow orders. They know what they're getting into. It doesn't even matter if we're prosecuted. I have 30 years to do. I certainly don't care about myself." J.A. 911.

Following the FCI Oakdale incident, the Bureau of Prisons (the "BOP") transferred Caro to USP Lee, a more secure facility. There, in August 2003, Caro and another inmate violently

---

[1]These convictions were for violations of Title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801-971.

attacked fellow Texas Syndicate member Ricardo Benavidez. Using "shanks," i.e., homemade knives, they stabbed Benavidez twenty-nine times. Five other Texas Syndicate members stood nearby with identical shanks.[2] In November 2003, after pleading guilty to conspiracy to commit homicide, Caro was sentenced to another twenty-seven years imprisonment. He was then transferred to the SHU at USP Lee.

Sandoval's murder occurred only weeks later. Sandoval was placed in Caro's cell at around 9:00 p.m. on December 16, 2003. The next day, Sandoval and Caro were served breakfast in their cell at 6:10 a.m. They later took one hour of recreation outside and were last observed by prison staff at 6:17 p.m.[3] Soon after, inmate Sean Bullock, whose cell faced Caro's, noticed Caro standing behind Sandoval and apparently choking him. Bullock watched them fall to the ground and assumed they were tussling. At about 6:40 p.m., a prison guard came to deliver mail. Caro yelled to him several times, "Come get this piece of shit out of here," and pointed at Sandoval lying by the door. J.A. 676. Peering inside the cell, the guard observed Sandoval lying motionless with blood on him and a towel knotted around his neck. Blood was also splattered against the wall.

Other guards quickly arrived and handcuffed Caro. When asked whether Sandoval was still breathing, Caro responded: "No. At this time he's stinking up the room, get him out." J.A. 684. Caro later received *Miranda* warnings and was interviewed. He denied that Sandoval's murder had any connection to the Texas Syndicate. Instead, Caro explained that he had eaten Sandoval's breakfast that morning; that Sandoval had awakened, cursed him, and threatened to eat Caro's

---

[2]In January 2004, Caro sent a letter to one Gomez requesting that Caro, Benavidez, and others who had been involved remain in good standing within the Texas Syndicate.

[3]Inmates housed in the SHU at USP Lee spend twenty-three hours per day in their cell and are allowed one hour of recreation outside per day.

breakfast the next morning; and that Caro, using a towel tied with one overhand knot, had later strangled Sandoval for four or five minutes until he stopped breathing.

The next day Caro taunted a prison guard, grinning and calling out, "When [are] you . . . going [to] assign [me] a new cellie?" J.A. 601. Several days later, again grinning, Caro requested fellow inmate Ortiz for his next "cellie." J.A. 680.

Caro later mentioned Sandoval in two telephone conversations and a letter. The letter stated, "I killed a guy two weeks ago . . . [f]or being a fool." J.A. 790. Caro told his wife, laughing, "[Sandoval] called me a mother fucker." J.A. 782. Caro also assured her, "But I'm all right." J.A. 783. Finally, Caro told another Texas Syndicate member Roel Rivas, "I also have a death," and explained, "It's because they gave me a cell mate and he disrespected me, so I took him down." J.A. 785. When Rivas proposed claiming self-defense, Caro said, "That is what I'm going to do . . . . That is what I'm going for." J.A. 786-87.

## B.

On January 3, 2006, Caro was charged in an indictment with first-degree murder in violation of 18 U.S.C. § 1111 for the killing of Sandoval. Soon after, pursuant to § 3593(a), the government filed a notice of intent to seek the death penalty under the FDPA. This statute established a procedure whereby a jury can decide whether to impose the death penalty after considering aggravating and mitigating factors properly alleged and proved during a sentencing hearing.[4] The

---

[4]The FDPA provides that a defendant convicted of any offense listed in § 3591 "shall be sentenced to death" if the sentencing body determines that "imposition of a sentence of death is justified" after considering the factors listed in § 3592. 18 U.S.C. § 3591. Specifically, the sentencing body must consider "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to

FDPA requires consideration of specific aggravating factors ("statutory aggravating factors") but also allows the government to allege other aggravating factors ("non-statutory aggravating factors").

Following a jury trial, Caro was convicted of premeditated murder in violation of § 1111. The same jury decided Caro's sentence under the FDPA. His sentencing hearing was divided into two phases, an "eligibility" phase and a "selection" phase. The first phase involved determining whether Caro had committed a capital offense under § 3591 and whether the government had proved at least one statutory aggravating factor beyond a reasonable doubt, together making Caro eligible for the death penalty. The second phase involved determining the mitigating and non-statutory aggravating factors and selecting either a death sentence or life imprisonment.

During the eligibility phase, the jury decided that Caro was eligible for the death penalty because § 3591 covered his offense of premeditated murder under § 1111, and two statutory aggravating factors had been proved beyond a reasonable doubt. These factors were (1) that Caro was previously con-

---

exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e).

Regarding the sentencing factors, § 3592(a) lists eight mitigating factors that must be considered, including a catch-all factor covering any relevant mitigating circumstance. Conversely, § 3592(c) lists sixteen aggravating factors that must be considered for a homicide offense, assuming notice has been given, and adds that "any other aggravating factor for which notice has been given" may be considered. 18 U.S.C. § 3592(c). A defendant has the "burden of establishing the existence of any mitigating factor . . . by a preponderance of the information," whereas the government has the "burden of establishing the existence of any aggravating factor . . . beyond a reasonable doubt." 18 U.S.C. § 3593(c). Because a death sentence cannot be imposed unless at least one statutory aggravating factor has been proved, statutory aggravating factors are determined before any alleged mitigating or non-statutory aggravating factors are considered.

victed of two offenses involving distribution of illegal drugs committed on different occasions and punishable by imprisonment for over one year, 18 U.S.C. § 3592(c)(10), and (2) that Caro was previously convicted of a federal drug offense punishable by five or more years, 18 U.S.C. § 3592(c)(12).

During the selection phase, the jury heard information and argument about the existence of mitigating factors, the existence of non-statutory aggravating factors, and whether aggravating factors sufficiently outweighed mitigating factors to justify a death sentence.[5] The government had alleged three non-statutory aggravating factors: (1) the impact of Caro's offense on Sandoval's friends and family; (2) Caro's future dangerousness to other people, including inmates; and (3) that Caro "has not expressed remorse for his violent acts, including (but not limited to) the murder of Sandoval, the stabbing of Benavidez and the gang-based assault in Oakdale." J.A. 57.

After closing arguments, the jury found that each alleged non-statutory aggravating factor had been proved beyond a reasonable doubt. The jury also found unanimously that twelve mitigating factors had been proved.[6] Some jurors

---

[5]We use the term "information" rather than "evidence" to conform to the FDPA's language and because here the Federal Rules of Evidence are inapplicable. *See* 18 U.S.C. § 3593(c) (allowing presentation of most information relevant to sentencing factors and providing that "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury").

[6]The jury found that Caro (1) was exposed to domestic violence growing up, (2) was not encouraged in school, (3) came from an impoverished community, (4) was well-behaved growing up, (5) failed to reach high school after needing special education, (6) was shy and respectful compared to his brothers, (7) was brought into illegal drug trafficking by his uncles, (8) never abused his wife or daughter, (9) was not violent or aggressive until his thirty-year prison sentence, (10) has never attacked prison staff, (11) has never tried to escape, and (12) has been securely detained since December 18, 2003.

found that four other mitigating factors had also been proved.[7] After considering whether the aggravating factors sufficiently outweighed the mitigating factors, the jury imposed the death penalty. This appeal followed.

Caro now challenges (1) the district court's voir dire process; (2) the denial of motions under *Brady* and Federal Rules of Criminal Procedure 16(a)(1)(E) and 17(c); (3) the constitutionality of § 3592(c)(10) and (12), the statutory aggravating factors that made Caro eligible for the death penalty; (4) the government's closing argument during the selection phase; (5) the district court's jury instruction and the government's argument concerning lack of remorse; (6) the rejection of Caro's proposed mercy instruction; and (7) decisions about whether to admit testimony offered under Federal Rule of Evidence 608(a), certain information about Sandoval, and Caro's offer to plead guilty. We consider each matter in turn.

## II.     Voir Dire

We begin by considering Caro's challenge to the voir dire conducted by the district court. We review voir dire for abuse of discretion. *See Ristaino v. Ross*, 424 U.S. 589, 594 (1976); *United States v. Brown*, 799 F.2d 134, 135-36 (4th Cir. 1986).

## A.

Prior to Caro's trial, the district court summoned one hundred fifty prospective jurors to the courthouse in groups of fifty. The government and Caro proposed questions for them, but the court determined what questions would be asked. Voir dire then occurred in two phases. First, prospective jurors completed written questionnaires. Second, the court divided

---

[7]One juror voted that Caro's father had a corrupting influence, five voted that Caro's execution would grieve his family, eight voted that Caro's life benefited his family, and nine voted that during a life sentence Caro would be "incarcerated in a secure federal institution." J.A. 1460.

them into groups of ten and questioned them orally. When a prospective juror's response was unsatisfactory, the court recalled him individually and asked follow-up questions.

To inform prospective jurors about the case, the written questionnaire stated, "The defendant, Carlos David Caro, is accused of murdering Roberto Sandoval in the United States Prison." J.A. 156. It continued, "Are your feelings about the death penalty such that you would always vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense, regardless of the facts and circumstances?" J.A. 161-62 (emphasis omitted). When prospective jurors convened for oral voir dire, the district court explained, "The defendant is charged with the first degree murder of Roberto Sandoval while both of them were inmates at the United States Penitentiary." J.A. 464.

For the oral voir dire, Caro proposed two questions that the district court declined to ask. Question fourteen of his proposed questions read: "Do you feel that anyone convicted of intentional and pre-meditated murder deserves to get the death penalty? If not, what kind of case does or does not deserve the death penalty?" J.A. 429. Instead, the court asked the following questions or some close variation: "[W]ould you automatically vote to impose the death penalty? . . . . In other words, would you consider life in prison without possibility of release, depending on the circumstances?" J.A. 502-03. The court also informed the parties: "I will consider in appropriate circumstances additional questions along the line that the defendant has suggested if I find it appropriate." J.A. 458. The court thus asked two seated jurors whether they could consider a life sentence for someone convicted of pre-meditated murder.

Question twenty-two of Caro's proposed questions read: "Do you believe that factors in a defendant's background, such as mental health issues, family background, childhood abuse or neglect, or a history of drug or alcohol abuse would

be important factors for a juror to consider in determining whether to impose the death penalty . . . ?" J.A. 430. The court declined to ask this proposed question, and instead explained: "If the case . . . goes to the penalty phase, then the jury would hear evidence in aggravation and mitigation; that is, evidence about circumstances that favor the death penalty, and circumstances that suggest that the death penalty would not be appropriate." J.A. 484.

### B.

To enforce the Sixth Amendment's guarantee of an impartial jury, district courts must conduct "adequate voir dire" to enable them "to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (emphasis omitted). Because "[a]ny juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law," the Supreme Court has held that "[a] defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception." *Morgan v. Illinois*, 504 U.S. 719, 735-36 (1992). However, "federal judges [are] accorded ample discretion in determining how best to conduct the voir dire." *Rosales-Lopez*, 451 U.S. at 189; *see United States v. Barber*, 80 F.3d 964, 967 (4th Cir. 1996) (noting that voir dire "must be committed to the good judgment of the trial judge whose immediate perceptions determine what questions are appropriate for ferreting out relevant prejudices" (internal quotations omitted)).

Caro contends that the district court failed to satisfy *Morgan* because, although prospective jurors were asked whether they would automatically impose a life or death sentence for "a death penalty eligible offense" or "first degree murder," they were not asked this question regarding "intentional and pre-meditated murder." In other words, Caro believes the voir dire was inadequate because prospective jurors were never

told that "death penalty eligible offense" or "first degree mur-
der" meant "intentional and pre-meditated murder." Caro also
contends that, because prospective jurors were never told that
information regarding Caro's personal background could be
considered mitigating, the court's voir dire could not weed out
prospective jurors who would refuse to consider any mitigat-
ing information about his troubled personal background.[8]

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996),
addressed similar issues. There, the district court asked pro-
spective jurors, "Do you have strong feelings in favor of the
death penalty?" *Id.* at 878. To those who failed to answer "no"
unequivocally, the court then asked whether "[they] would
always vote to impose the death penalty in every case where
a defendant is found guilty of a capital offense." *Id.* We found
this questioning satisfactory.

We explained that *Morgan* established "the right, grounded
in the Sixth Amendment, to a voir dire adequate to assure a
defendant a jury all of whose members are able impartially to
follow the court's instructions and evaluate the evidence," that
is, "the right to an inquiry sufficient to ensure——within the
limits of reason and practicality——a jury none of whose
members would unwaveringly impose death after a finding of
guilt and hence would uniformly reject any and all evidence
of mitigating factors, no matter how instructed on the law."

---

[8]Caro also claims that the district court erred by not questioning pro-
spective jurors individually. Because he never raised this issue below, we
review for plain error. *See United States v. Rolle*, 204 F.3d 133, 138 (4th
Cir. 2000). We conclude that the court did not err because the Constitution
does not require individual questioning of prospective jurors. *See Mu'Min
v. Virginia*, 500 U.S. 415, 431-32 (1991) (finding no error where a trial
court denied a motion for individual questioning, questioned prospective
jurors in small groups, and asked follow-up questions of prospective jurors
who showed possible bias); *United States v. Bakker*, 925 F.2d 728, 734
(4th Cir. 1991) ("[I]t is well established that a trial judge may question
prospective jurors collectively rather than individually. . . . This is espe-
cially true where . . . the trial court provides for individual questioning of
a juror whose initial responses prove less than satisfactory . . . .").

*Tipton*, 90 F.3d at 878 (internal quotations omitted). We then added: "Just how an inquiry adequate for this specific purpose should be conducted is committed to the discretion of the district courts." *Id.* However, we also pointed out, "Obviously, the most direct way to get at the possibility that a prospective juror would always impose death following conviction is to put that very 'reverse-*Witherspoon*' question directly to him," i.e., to ask whether the person would be irrevocably committed to voting for the death penalty regardless of the facts and circumstances.[9] *Id.*

Here, the district court asked, "Are your feelings about the death penalty such that you would always vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense, regardless of the facts and circumstances?" J.A. 161-62 (emphasis omitted). This is precisely the type of "reverse-*Witherspoon*" question that *Tipton* approved. Because this question, standing alone, adequately enabled the district court to weed out prospective jurors irrevocably committed to imposing the death penalty, the district court's decision not to adopt Caro's proposed question fourteen was not an abuse of discretion. *See also Oken v. Corcoran*, 220 F.3d 259, 266 n.4 (4th Cir. 2000) ("We . . . reject the suggestion that the trial court was required to ask potential jurors whether they would automatically impose the death penalty in rape-murder cases because . . . *Morgan* does not require crime-specific voir dire questions.").

For the same reason, the district court's failure to adopt Caro's proposed question twenty-two about mitigation also was not an abuse of discretion. The above "reverse-

_____

[9]*Tipton* was referring to *Witherspoon v. Illinois*, 391 U.S. 510 (1968), where the Supreme Court found that excluding a juror who was "irrevocably committed to . . . vote against the death penalty regardless of the facts and circumstances" does not violate the Sixth Amendment. *Id.* at 523. Thus, a "reverse-*Witherspoon*" question asks prospective jurors whether they are irrevocably committed to voting for the death penalty.

*Witherspoon*" question adequately enabled the district court to weed out prospective jurors who would not consider mitigating evidence relating to Caro's personal background. The mere conjecture that more detailed questioning would have elicited information useful to Caro does not suggest that the district court erred. *See Tipton*, 90 F.3d at 878 (affirming the district court's decision not to make "inquiries into the prospective jurors' willingness to consider factors such as a defendant's 'deprived, poor background,' 'emotional, physical abuse,' 'young age,' 'limited intelligence,' and 'brain disfunction'"). "The undoubted fact that such detailed questioning might have been somehow helpful to [Caro] in exercising peremptory challenges does not suffice to show abuse of the district court's broad discretion in conducting the requisite inquiry." *Id.* at 879.

## III.    Discovery

Next we review the district court's denial of Caro's motions under *Brady* and Federal Rules of Criminal Procedure 16(a)(1)(E) and 17(c). Because no factual findings were made, we review the *Brady* decision de novo.[10] *See United States v. Mejia*, 82 F.3d 1032, 1036 (11th Cir. 1990) (reviewing a *Brady* decision de novo); *United States v. Kennedy*, 890 F.2d 1056, 1058 (9th Cir. 1989) (same). We review the decision under Rule 16(a)(1)(E) for abuse of discretion. *United States v. Afrifa*, No. 95-5753, 1996 WL 370180, at *1 (4th Cir. July 3, 1996); *see United States v. Fletcher*, 74 F.3d 49, 54 (4th Cir. 1996) (noting that Rule 16 "plac[es] the decision regarding pre-trial disclosure of witness lists within the sound discretion of the trial court"). And we also review the decision under Rule 17(c) for abuse of discretion. *United States v. Fowler*, 932 F.2d 306, 311 (4th Cir. 1991).

---

[10]We reviewed for clear error in *United States v. Trevino*, 89 F.3d 187, 190 (4th Cir. 1996), but there the district court had reviewed the requested material *in camera* before denying the defendant's motion to compel. The court's findings were thus factual rather than purely legal.

A.

Under 18 U.S.C. § 3593(c) the government alleged a non-statutory aggravating factor of future dangerousness. In response, Caro hired risk-assessment expert Mark Cunningham to testify that Caro would be unlikely to endanger anyone during a life sentence because the BOP would adequately secure Caro in the Control Unit at the Administrative Maximum United States Penitentiary in Florence, Colorado ("Florence ADMAX"), the BOP's most secure facility,[11] until concluding that Caro was no longer dangerous. In turn, the government planned to have former warden of Florence ADMAX Gregory Hershberger testify that Florence ADMAX could not fully secure Caro and that the BOP would likely transfer him to another facility about three years after his arrival.

To inform Cunningham's testimony, Caro requested information from BOP records relating to whether inmates like Caro are housed at Florence ADMAX, how well Florence ADMAX prevents violence, and when inmates like Caro normally are transferred from Florence ADMAX to other facilities with less security. Specifically, Caro requested the following:

> A. Data showing median length of stay, range of length of stay and standard deviation of the distribution of length of stay at Florence ADMAX for all inmates since it was opened in 1994 to the present time;

---

[11]Called the "Alcatraz of the Rockies," Florence ADMAX houses the BOP's most dangerous inmates. *See* Dan Eggen, *New Home is "Alcatraz of the Rockies*," Wash. Post, May 5, 2006, at A6. Guinness World Records has dubbed Florence ADMAX the most secure prison in the world. *Guinness World Records 2001* 53 (Mint Publishers, Inc. 2001); *see Scarver v. Litscher*, 434 F.3d 972, 974 (7th Cir. 2006) (calling Florence ADMAX "the most secure prison in the federal system").

B. Data showing how many inmates who were admitted to Florence ADMAX in 1994 or 1995 continue to be confined there, broken down by offense conduct that caused them to be transferred to Florence ADMAX;

C. Movement sheets from the central inmate file on every inmate who has killed another inmate within the Bureau of Prisons, ("BOP"), within the last 20 years;

D. Investigative reports on all inmate homicides within the BOP within the last 20 years including any "after action reports" indicating any operational or institutional changes in response to each killing and any final memoranda from Special Investigative Services to the Warden of each institution regarding each killing;

E. Regarding each inmate involved in an inmate killing within the BOP within the last 20 years, the respective inmate's "Chronological Disciplinary Record" and Inmate History ADM-REL and/or movement Sheets within the Bureau of Prisons;

F. Records on any assaultive conduct by an inmate in the "Control Unit" at Florence ADMAX from November 1994 to present date, showing the inmate involved, inmate number of the inmate involved, date of occurrence and description of the conduct, and the staff member victim of each assault;

G. Names, prison numbers, assignment rationale and tenures of all inmates in the Control Unit at Florence ADMAX since opening in 1994 to present date showing date assigned, the reason assigned and date exiting the Control Unit to lesser security or release from BOP;

H. Disciplinary Incident Reports on all inmates in the Control Unit at Florence ADMAX from 1994 to present date showing inmate name, number, date of offense and details of disciplinary incident; and

I. Correctional Services Significant Incidents Data on levels and frequency of violence at each security level at Florence ADMAX by year from 2001 through 2006.

J.A. 396-97.

After the government denied this request, Caro filed various motions. Two motions requested subpoenas *duces tecum* under Rule 17(c) compelling the BOP's director and Florence ADMAX's warden to produce the information. Another motion requested a court order compelling the government to produce the information under Rule 16(a)(1)(E). The final motion requested a court order compelling the government to produce the information under *Brady*.

Following an evidentiary hearing,[12] a magistrate judge concluded that Rule 16(a)(1)(E) and *Brady* did require the government to produce the information that Caro had requested. The court emphasized that, "despite . . . [its] inquiries at the November 3 hearing, the government ha[d] produced no evidence through affidavit or otherwise as to its argument that production of the documents and information requested would be burdensome to the BOP." J.A. 290.

The government objected to this order. On November 20, 2006, the district court denied all four motions. It reasoned that the information requested was immaterial to Caro's

---

[12]During this hearing, the government represented that "it d[id] not intend to use any of the documents sought in the Discovery Motions in its case-in-chief during either the guilt or the penalty phase of this case." J.A. 289.

defense. *See United States v. Caro*, 461 F. Supp. 2d 478, 481 (W.D. Va. 2006). However, the court commented:

> I point out, however, that I do so in light of the government's representation that it does not intend to introduce any of the requested data in its own case. Otherwise, Rule 16 might very well require its prior disclosure to the defendant. Accordingly, absent proper disclosure, the government may not rely on specific instances of inmate violence (other than the defendant's own) in seeking to prove his future dangerousness.

*Id.* at 481-82. Although Caro's requested information was withheld, Cunningham visited Florence ADMAX, spoke with BOP personnel, and received information not covered by Caro's initial request, including Caro's inmate file and Florence ADMAX's official policies.

During Caro's sentencing hearing, the government, anticipating Cunningham's testimony, offered evidence that Florence ADMAX could not fully secure Caro. This evidence included descriptions of specific instances of violence by inmates other than Caro. For example, Daniel Olsen, a code breaker for the government, testified about an inmate at Florence ADMAX who sent a coded message ordering a homicide. Former warden Hershberger testified that inmates killed two guards at the United States Penitentiary in Marion, Illinois, the predecessor to Florence ADMAX. He also testified that Florence ADMAX inmates lashed out against prison staff, using any weapons they could find. Finally, Hershberger asserted that "no system that the Bureau of Prisons has been able to devise to control the inmates is completely failsafe." J.A. 1341. He indicated that the BOP could not guarantee that someone like Caro would never make a weapon or send a coded message to fellow gang members.

Hershberger further described the "step down" program at Florence ADMAX designed to channel inmates back into

general prison populations at other facilities. Hershberger stated that this could be done in three years; Cunningham testified that the average was five years. Hershberger further explained that inmates sentenced to death are housed at Federal Correctional Complex Terre Haute, which has very high security, and are never transferred to other facilities.

By contrast, Cunningham testified that Caro would not likely endanger anyone while serving a life sentence because, given his personal characteristics, the BOP would probably house him at Florence ADMAX until he stopped being dangerous. Cunningham admitted, however, that "for the next five to ten years [Caro] would pose a significant risk if at large in a U.S. penitentiary." J.A. 1268.

On cross-examination, the government questioned Cunningham using the affidavit he submitted for Caro's discovery motions. This affidavit listed forty-seven inmates who committed homicide in prison and argued that Caro needed more information about these inmates to prepare his defense. The government asked whether Cunningham knew those inmates' current locations. Defense counsel objected, saying the government had withheld this information, but the district court overruled the objection. Using the Inmate Locator on the BOP's public website, the government then showed that, for example, Bruce Pierce had committed homicide in prison and been transferred away from Florence ADMAX. Cunningham admitted this but chafed:

> The critical issue is what happened to him between the time he was guilty of the killing, and . . . now that he's at Lewisburg[,] . . . where did he go for how long, why did they decide to put him in Lewisburg, at what level of Lewisburg is he in with what disciplinary history. So just to put his name up and show where he is is misleading, at best, in the face of the data that I requested from you that would have fully informed this issue for me and for the jury.

J.A. 1298. The government then made the same point for another inmate, David Fleming, and implied that other inmates listed in Cunningham's affidavit also had been transferred away from Florence ADMAX.

During their closing arguments, both sides debated whether the BOP would adequately secure Caro during a life sentence. The jury ultimately found unanimously that the government had proved Caro's future dangerousness beyond a reasonable doubt; only nine jurors found that during a life sentence Caro would be "incarcerated in a secure federal institution." J.A. 1460. Caro now challenges the district court's denial of his motions under *Brady* and Rules 17(c) and 16(a)(1)(E). *See Caro*, 461 F. Supp. 2d at 481.

### B.

We first review the district court's denial of Caro's motion under *Brady*. In *Brady*, the Supreme Court announced that the Due Process Clause requires the government to disclose "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment." 373 U.S. at 87. Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* We have often noted that *Brady* requests cannot be used as discovery devices. As the Supreme Court remarked, "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).

The district court denied Caro's motion under *Brady* because Caro failed to establish that the information requested would be favorable to him. We agree. Because Caro can only speculate as to what the requested information might reveal, he cannot satisfy *Brady*'s requirement of showing that the

requested evidence would be "favorable to [the] accused." *Brady*, 373 U.S. at 87; *see United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

C.

We next review the denial of Caro's motions requesting Rule 17(c) subpoenas. Rule 17(c) "implements the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor." *In re Martin Marietta Corp.*, 856 F.2d 619, 621 (4th Cir. 1988). Rule 17(c) lets a defendant subpoena information, but provides that "the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). The Supreme Court has held that a Rule 17(c) subpoena is "unreasonable or oppressive" unless the party requesting it demonstrates:

> (1) that the documents are evidentiary and relevent [sic]; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*United States v. Nixon*, 418 U.S. 683, 699-700 (1974). Accordingly, a defendant seeking a Rule 17(c) subpoena "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Id.* at 700. We have emphasized that "Rule 17(c) . . . is not a discovery device." *Fowler*, 932 F.2d at 311 (citing *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951)).

The district court denied Caro's motions for Rule 17(c) subpoenas because "a Rule 17 subpoena *duces tecum* cannot substitute for the limited discovery otherwise permitted in criminal cases and the hope of obtaining favorable evidence does not justify the issuance of such a subpoena." *Caro*, 461 F. Supp. 2d at 481. This decision was not an abuse of discretion. Caro can only speculate as to what the requested information would have shown. Moreover, his requested Rule 17(c) subpoenas cast a wide net that betokens a "general 'fishing expedition,'" *Nixon*, 418 U.S. at 700, and they merely duplicate Caro's discovery motion under Rule 16(a)(1)(E).

D.

Finally, we consider the district court's denial of Caro's motion under Rule 16(a)(1)(E). Rule 16 differs from *Brady*, which rests upon due process considerations, and provides the minimum amount of pretrial discovery granted in criminal cases. *See United States v. Baker*, 453 F.3d 419, 424 (7th Cir. 2006) ("Rule 16 . . . is broader than *Brady*."); *United States v. Conder*, 423 F.2d 904, 911 (6th Cir. 1970) ("We are . . . of the view that the disclosure required by Rule 16 is much broader than that required by the due process standards of *Brady*."). Setting out the discovery to which defendants are entitled, section (a)(1)(E) provides:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> (i) the item is material to preparing the defense;
>
> (ii) the government intends to use the item in its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E). The government does not dispute that the information requested by Caro is "within the government's possession, custody, or control,"[13] and Caro does not assert that subsection (ii) or (iii) applies.[14] *Id.* Therefore, we focus on subsection (i).

Under subsection (i), the government must make available to the defendant any requested items that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). For the defendant to show materiality under this rule, "[t]here must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *United States v. Ross*, 511 F.2d 757, 763 (5th Cir. 1975), *cert. denied*, 423 U.S. 836.[15]

---

[13]We note that certain discovery requests that Caro made may fall outside Rule 16 because they apparently call for data processing. For example, Caro requested "[d]ata showing median length of stay, range of length of stay and standard deviation of the distribution of length of stay at Florence ADMAX." J.A. 396. Assuming that here Caro requests statistical analysis, the government would not have been obliged to comply under Rule 16, which requires only that "the government must permit the defendant to inspect and to copy or photograph" requested items. Fed. R. Crim. P. 16(a)(1)(E). However, the government never raised this argument.

[14]When asked during oral argument whether Caro asserted any claim arising from the government having violated the district court's order that it "may not rely on specific instances of inmate violence (other than the defendant's own) in seeking to prove his future dangerousness," *Caro*, 461 F. Supp. 2d at 482, counsel for Caro stated that she noted the government's misconduct merely to bolster her argument about subsection (i). Regardless of whether subsection (ii) would apply, we cannot grant relief that Caro plainly failed to request.

[15]Although we have not adopted this *Ross* standard in any published opinion, we have in two unpublished opinions. *See United States v. Farah*, No. 06-4712, 2007 WL 2309749, at *4 (4th Cir. Aug. 14, 2007); *United States v. Kirk*, No. 88-5095, 1989 WL 64139, at *2 (4th Cir. June 2, 1989). Numerous other circuits also follow *Ross*. *See Baker*, 453 F.3d at 425;

"[E]vidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (citations and internal quotations omitted).

The district court denied Caro's motion upon finding no indication that the information requested by Caro would support Cunningham's testimony. The information was relevant to future dangerousness and might have allowed Cunningham to formulate scientifically more reliable opinions about Caro and to test various government allegations, e.g., that gang membership made Caro more dangerous. However, Caro presented no facts whatsoever indicating that the information would have actually helped prove his defense. *See United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990) ("Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense."). No one can say, for example, whether Cunningham's more reliable opinions would have actually favored Caro or whether Cunningham would have found any government allegations unsupported. For this reason, the district court did not abuse its discretion by finding that the requested information was not "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).

---

*United States v. Jordan*, 316 F.3d 1215, 1251 (11th Cir. 2003); *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998); *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993); *United States v. Marshall*, 532 F.2d 1279, 1285 (9th Cir. 1976); *United States v. Scott*, No. 92-6272, 1993 WL 411596, at *3 (10th Cir. Oct. 8, 1993); *see also United States v. RMI Co.*, 599 F.2d 1183, 1188 (3d Cir. 1979) (noting the *Ross* standard in another context). Like our sister circuits, we believe *Ross* provides an adequate formula for applying Rule 16. Having said that, we stress that "materiality" in Rule 16(a)(1)(E)(i) differs from "materiality" under *Brady*, which is grounded in the Due Process Clause.

## IV.    Statutory Aggravating Factors

We next consider Caro's constitutional challenge to 18 U.S.C. § 3592(c)(10) and (12), the statutory aggravating factors that made him eligible for the death penalty. Caro preserved this challenge below by unsuccessfully moving to strike. "We review de novo a properly preserved constitutional claim." *United States v. Hall*, 551 F.3d 257, 266 (4th Cir. 2009).

As we have noted, the government had to establish at least one statutory aggravating factor to make Caro eligible for the death penalty. Moreover, the jury had to consider all aggravating and mitigating factors in determining whether imposing a death sentence was justified. For homicide defendants, the FDPA enumerates sixteen statutory aggravating factors. *See* 18 U.S.C. § 3592(c). During the eligibility phase of Caro's sentencing hearing, the jury found that the following two had been proved beyond a reasonable doubt:

> (10) Conviction for two felony drug offenses.—The defendant has previously been convicted of 2 or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.

> * *

> (12)    Conviction    for    serious    Federal    drug offenses.—The defendant had previously been convicted of violating title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of 5 or more years may be imposed or had previously been convicted of engaging in a continuing criminal enterprise.

18 U.S.C. § 3592(c)(10), (12). Both aggravating factors were based on Caro's previous convictions for nonviolent drug

offenses. Caro had stipulated to being convicted of possession with intent to distribute marijuana in 1988, conspiracy to possess with intent to distribute marijuana in 1994, and possession with intent to distribute cocaine in 2001. He had stipulated that these offenses met § 3592(c)(10) and (12). Having unsuccessfully moved to strike, Caro now argues that these two statutory aggravating factors violate the Eighth Amendment because they are not "rationally relate[d] to the question who should live or die." Appellant's Br. at 130.

The Eighth Amendment requires that a capital sentencing scheme must limit "[c]apital punishment . . . to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (internal quotations omitted). The FDPA establishes various safeguards intended to meet this standard. Among them are the following:

- § 3591 authorizes the death penalty only for certain crimes;

- § 3593(e) requires that at least one statutory aggravating factor be established before a death sentence may be considered;

- § 3592(a) mandates consideration of mitigating factors when selecting a death sentence; and

- § 3595(c) calls for reconsidering any death sentence influenced by arbitrary factors, resulting from insufficient evidence, or involving legal error not harmless beyond a reasonable doubt.

Regarding the second safeguard, i.e., that at least one statutory aggravating factor must be established before a death sentence may be considered, the Supreme Court has said that "each statutory aggravating circumstance must satisfy a con-

stitutional standard derived from the principles of *Furman*," *Zant v. Stephens*, 462 U.S. 862, 876 (1983), which reversed death sentences because Georgia had "permit[ted] this unique penalty to be so wantonly and so freakishly imposed," *Furman v. Georgia*, 408 U.S. 238, 310 (1972) (Stewart, J., concurring). *See Gregg v. Georgia*, 428 U.S. 153, 189 (1976) ("[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action"); *Gardner v. Florida*, 430 U.S. 349, 358 (1977) ("It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."). Specifically, the Court articulated two requirements: "an aggravating circumstance [1] must genuinely narrow the class of persons eligible for the death penalty and [2] must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877. *See, e.g.*, *id.* at 879 (approving the aggravating factors of having "escaped from lawful confinement" and having "a prior record of conviction for a capital felony" because they "adequately differentiate this case in an objective, evenhanded, and substantively rational way from . . . murder cases in which the death penalty may not be imposed"); *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980) (reversing a death sentence because the narrowing factor did not reflect "a consciousness materially more 'depraved' than that of any person guilty of murder").

Caro argues that § 3592(c)(10) and (12) do not satisfy these two requirements. We find his argument unpersuasive. Regarding the first requirement, the Supreme Court explained that "the [aggravating] circumstance may not apply to every defendant convicted of [the offense]; it must apply only to a subclass of defendants." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). Section 3592(c)(10) and (12) clearly meet this forgiving standard. Although some drug offenses are quite

common, not all homicide defendants have prior convictions that satisfy § 3592(c)(10) or (12). Furthermore, these aggravating factors differ markedly from ones the Supreme Court has invalidated for not genuinely narrowing the class of defendants eligible for the death penalty. *See Godfrey*, 446 U.S. at 428-29 (reviewing the factor, "that the offense was outrageously or wantonly vile, horrible and inhuman," and concluding that "[a] person of ordinary sensibility could fairly characterize almost every murder as outrageously or wantonly vile, horrible and inhuman" (internal quotations omitted)); *Maynard v. Cartwright*, 486 U.S. 356, 363-64 (1988) (reviewing the factor, "especially heinous, atrocious, or cruel," and concluding that "an ordinary person could honestly believe that every unjustified, intentional taking of human life is especially heinous" (internal quotations omitted)).

Regarding the second requirement, one can hardly dispute the congressional wisdom that recidivism justifies harsher sentencing. Defendants with significant criminal histories demonstrate unwillingness or inability to follow the law. This justifies imposing harsher sentences to provide increased retribution and deterrence. Prior convictions are thus properly and routinely considered in federal sentencing. *See Almendarez-Torres v. United States*, 523 U.S. 224, 230 (1998) ("[P]rior commission of a serious crime . . . is as typical a sentencing factor as one might imagine."). Moreover, the felony drug offenses described by § 3592(c)(10) and (12) are serious indeed, however common may be their commission. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000) ("There is no doubt that traffic in illegal narcotics creates social harms of the first magnitude."). Although Caro's prior convictions satisfying § 3592(c)(10) and (12) might be considered "nonviolent" by themselves, illegal drugs have long and justifiably been associated with violence. *See United States v. Green*, 436 F.3d 449, 459 (4th Cir. 2006) (noting that Congress "made the policy determination that recidivism for drug dealing, without more, is especially dangerous"); *United States v. Ward*, 171 F.3d 188, 195 (4th Cir. 1999) ("Guns are

tools of the drug trade."). Therefore, we find that these statutory aggravating factors reasonably justify imposing a more severe sentence on Caro compared to others.

For the reasons stated above, we conclude that § 3592(c)(10) and (12) do not violate the Eighth Amendment.[16] In so concluding, we follow the only other circuit to have considered this issue. *See United States v. Bolden*, 545 F.3d 609, 616-17 (8th Cir. 2008) (upholding § 3592(c)(10)).

## V.     Closing Argument

We next consider Caro's challenge to the government's closing argument during the selection phase. Caro asserts that various remarks by the government violated the Fifth Amendment's Due Process Clause. In assessing alleged prosecutorial misconduct, we ask "whether the [misconduct] so infected the

---

[16]The dissent presupposes that each statutory aggravating factor standing alone must narrow the class of persons eligible for the death penalty to include only those who deserve a death sentence. Specifically, the dissent invokes the "pyramid" metaphor *Zant* adopted to describe Georgia's capital sentencing scheme, "with the death penalty applying only to those few cases which are contained in the space just beneath the apex," 462 U.S. at 871 (internal quotations omitted), and concludes that "the question raised by Caro's appeal is whether the two [statutory] aggravating factors found by the jury are constitutionally sufficient to move him from the base to the apex . . . ." Dis. Op. at 56. Existing Supreme Court precedent does not impose such a requirement. A capital sentencing scheme as a whole must limit "[c]apital punishment . . . to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." *Roper*, 543 U.S. at 568 (internal quotations omitted). However, it does not follow that a statutory aggravating factor alone must satisfy that requirement. (Indeed, the FDPA contains various safeguards intended to satisfy that requirement when taken together.) Instead, the Supreme Court stated that a statutory aggravating factor need only "genuinely narrow the class of persons eligible for the death penalty and . . . reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877. For the reasons stated above, § 3592(c)(10) and (12) plainly satisfy this standard.

trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotations omitted). To prove reversible error, the defendant must show (1) "that the prosecutor's remarks or conduct were improper" and (2) "that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." *United States v. Scheetz*, 293 F.3d 175, 185 (4th Cir. 2002).

A.

The government's closing argument during the selection phase stressed that only a death sentence could "control" Caro. Particularly, the government indicated that a death sentence should be imposed because the BOP would not secure Caro adequately to prevent future violence. The government argued, "[E]very time the Bureau of Prisons has attempted to control Carlos Caro, to, to bring whatever pressure they had to bear, whatever security they had to bear on him, . . . he has defeated those attempts." J.A. 1395. It added, "[C]an he be controlled in the Bureau of Prisons? I suspect the answer to that question is no. . . . The reason he can't be controlled is because the system is not failsafe." J.A. 1399. Responding to Cunningham's testimony that during a life sentence Caro would be incapacitated at Florence ADMAX until the BOP found him no longer dangerous, the government remarked: "[W]hat about this classification system that the BOP has? The question is can we rely on the BOP to send Caro to a place where he won't kill? . . . [W]e know that the system for classification is not failsafe." J.A. 1401-02.

The government later asserted, "There is simply nothing the Bureau of Prisons can do to deter [Caro]," but explained, "There is one thing that we can do." J.A. 1404. The government continued, "[W]hat is the way that we can deter Carlos Caro? When I say we, this is something I can't do, the judge can't do it, because the question of the death penalty, ladies

and gentlemen, is left exclusively to you, the jury. It's your decision." J.A. 1404. The government concluded:

> So, ladies and gentlemen, we now come to you. You're it. I'm the United States Attorney, powerless to control Caro. United States District Judge, federal judge, powerless to do it. The law allows one last option, and that is you. And only you. Judge Jones will do what you say. You go back there and find a unanimous verdict for life, that's what he will impose. You find death, that's what he'll do. The authority and the responsibility for the control of Carlos David Caro is in your hands. We have done all we can do. And so we come to you.

J.A. 1438-39.

### B.

Caro's principal challenge here relates to the government's argument that only a death sentence could control Caro.[17] Although we find this argument troubling for the reasons discussed below, we cannot conclude that Caro suffered such prejudice as to warrant reversal.

---

[17]Caro makes other challenges that are unpersuasive, but only one merits discussion. He challenges the government's argument that a life sentence would send bad messages. The government stated that a life sentence would tell the Texas Syndicate, "[Y]ou can kill and it's okay," J.A. 1436; would tell prison staff and inmates, "It's open season because in this community there's no punishment for murder," J.A. 1436; and would tell Sandoval's parents "that their son's life was meaningless," J.A. 1435. Because the decision whether to impose the death penalty should involve "an individualized determination on the basis of the character of the individual and the circumstances of the crime," *Zant*, 462 U.S. at 879 (emphasis omitted), the government's comments about messages sent to anyone other than Caro might have been improper. Regardless whether we found them improper, however, these comments did not prejudice Caro enough to violate the Due Process Clause because they were isolated and unlikely to mislead the jury. *See Scheetz*, 293 F.3d at 175.

The FDPA created an analytical framework for considering the death penalty clearly designed to minimize arbitrariness. The Supreme Court explained that the decision whether to select the death penalty should involve "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879 (emphasis omitted). The suggestion that the BOP would not secure Caro adequately to prevent future violence implicates policy and resource considerations that are quite different. *See Tucker v. Kemp*, 762 F.2d 1496, 1508 (11th Cir. 1985) (en banc) ("Neither the future diligence of an appellate court nor the possibility of future incompetence of corrections and parole personnel should be invoked to alter the jury's perception of its role at capital sentencing."). Moreover, calling upon the jury to "control" Caro gives them a role more akin to law enforcement than to impartial arbitration between the defendant and government. *See United States v. Young*, 470 U.S. 1, 18 (1985) ("The prosecutor was . . . in error to try to exhort the jury to 'do its job'; that kind of pressure . . . has no place in the administration of criminal justice.").

Our concerns notwithstanding, on these facts we cannot find such prejudice as to warrant reversal. We reach that conclusion based on various factors we have found relevant when assessing prejudice:

> (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury.

*Scheetz*, 293 F.3d at 186.

The government's comments about the jury's role were isolated and not extensive. More significantly, regarding the government's comments about whether the BOP would adequately secure Caro to prevent future dangerousness, Caro's own argument opened the door. Caro's expert Cunningham acknowledged that Caro remained dangerous, but testified that Caro would not endanger anyone because the BOP would incapacitate him at Florence ADMAX.[18] This plainly invited the government to respond that, actually, the BOP would not secure Caro adequately to prevent future violence.

Furthermore, the district court's instructions counterbalanced any improper comments. The court stated that the jury should "make a unique, individualized judgment about the justification for and appropriateness of the death penalty . . . ." Trial Tr. 105, Doc. 687, June 19, 2004. The court also cautioned, "I remind you that the statements, questions, and arguments of counsel are not evidence." Trial Tr. 102.

Finally, each alleged non-statutory aggravating factor was well supported by the record. Most notably, Caro's previous violent conduct, his statements evincing indifference to punishment, and Cunningham's own admission about Caro's future dangerousness certainly sufficed to establish the non-statutory aggravating factor of future dangerousness. Therefore, we cannot say that the government's closing argument "prejudicially affected [Caro's] substantial rights so as to deprive him of a fair trial." *Scheetz*, 293 F.3d at 185.

---

[18]Cunningham admitted, "[I]n the general population of a U.S. penitentiary, there is a very high risk that Mr. Caro would seriously injure someone else." J.A. 1267.

## VI.   Lack of Remorse

We next consider Caro's Fifth Amendment claim regarding lack of remorse. Caro argues that the government and district court violated his Fifth Amendment privilege against self-incrimination by having the jury consider Caro's failure to speak words of remorse. The government admits referring to Caro's silence during closing argument but contends that the Fifth Amendment permitted using silence to prove the non-statutory aggravating factor of lack of remorse. "We review de novo a properly preserved constitutional claim." *Hall*, 551 F.3d at 266. Given the court's cautionary instruction and overwhelming information showing Caro's lack of remorse, we conclude that any error would have been harmless under 18 U.S.C. § 3595(c)(2).

## A.

The government's notice of intent to seek the death penalty under the FDPA asserted a non-statutory aggravating factor of lack of remorse. Cases in which the government has properly established this non-statutory aggravating factor have generally involved affirmative words or conduct. *See, e.g.*, *United States v. Basham*, 561 F.3d 302, 334 (4th Cir. 2009) (deeming evidence of drug use and sexual encounters during a crime spree highly probative of lack of remorse); *Emmett v. Kelly*, 474 F.3d 154, 170 (4th Cir. 2007) (holding that a statement, made in response to police questioning about a murder, that the victim "was 'an asshole' who 'wouldn't loan me no money'" showed lack of remorse). Here, however, the government alleged that "Carlos David Caro *has not expressed remorse* for his violent acts, including (but not limited to) the murder of Sandoval, the stabbing of Benavidez and the gang-based assault in Oakdale." J.A. 57 (emphasis added).

Caro objected and moved to strike the government's allegation, arguing that "[e]vidence of lack of remorse must be more than mere silence on the part of the defendant and must not

implicate his constitutional right to remain silent." J.A. 75. Caro also objected to the district court's proposed jury instruction, which referred to the government's allegation but cautioned, "[M]ere silence, alone, by the defendant should not be considered as proof of lack of remorse." J.A. 1449. Caro proposed the following alternative:

> The government has alleged as a non-statutory aggravating factor that Carlos David Caro has not expressed remorse for the killing of Roberto Sandoval. . . . To find this aggravating factor, the government must prove beyond a reasonable doubt that Carlos David Caro, by his words or his actions, indicated a pervading and continuing lack of remorse for the killing of Roberto Sandoval. Mere silence on his part or the absence of an affirmative expression of remorse on his part may never be the basis of a lack of remorse because Carlos David Caro has a Constitutional right to remain silent which cannot be used against him for any purpose.

J.A. 459. The district court declined to give this proposed instruction. The court also overruled Caro's objection and denied his motion to strike, reasoning that the government intended to prove Caro's lack of remorse "by his actions and statements, not by mere silence." *United States v. Caro*, No. 06-1, 2006 WL 1594185, at *7 (W.D. Va. June 2, 2006).

The government's closing argument during the selection phase addressed this issue. The government pointed out Caro's failure to apologize:

> We talk about lack of remorse as being an aggravator. You know, a lot of times we do things, and you sit around and you say, "Gee, boy, I shouldn't have done that. I'm sorry I did that." All of us do things like that. We, many times we apologize to our family members, our friends, and say "Gee, what was I

thinking? I didn't mean to do that." Have we seen any remorse at all from Carlos Caro with regard to any of the bad stuff that he's ever done? No.

J.A. 1397. The government also mentioned Caro's callous remarks following Sandoval's death; Cunningham's testimony, "Well, I'm assuming Carlos Caro has no remorse," J.A. 1398; and Caro's January 2004 letter to Gomez showing more concern about Caro's standing among Texas Syndicate members than about Benavidez's suffering. The government also mentioned Caro's failure to apologize to Gomez for killing Sandoval.

At the close of argument, the district court gave the following jury instruction:

> C, lack of remorse. The Government has alleged that Carlos David Caro has not expressed remorse for his violent acts, including the murder of Roberto Sandoval, the stabbing and attempted murder of Ricardo Benavidez, and the gang based assault at Oakdale. Remember that the defendant has a constitutional right to remain silent, and mere silence, alone, by the defendant should not be considered as proof of lack of remorse.

J.A. 1448-49. The court later cautioned: "The defendant did not testify. The law gives him that right. . . . Accordingly, the fact that the defendant did not testify must not be considered by you in any way, or even discussed in arriving at your decision." Trial Tr. 115-16.

The verdict form stated: "Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant has not expressed remorse for killing Roberto Sandoval?" J.A. 1459. Beside this question, the foreperson checked a blank labeled "Yes." J.A. 1459.

## B.

The Fifth Amendment privilege against self-incrimination guarantees every criminal defendant "the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty for such silence.'" *Estelle v. Smith*, 451 U.S. 454, 468 (1981) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)). Thus it "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965); *see Miranda v. Arizona*, 384 U.S. 436, 468 n.37 (1966) (noting that a prosecutor may not "use at trial the fact that [a defendant] stood mute or claimed his privilege in the face of accusation").

The Supreme Court has recognized that the Fifth Amendment applies during sentencing hearings. *See Mitchell v. United States*, 526 U.S. 314, 327 (1999); *see also Estelle*, 451 U.S. at 463 (applying the Fifth Amendment to capital sentencing). In *Mitchell*, the defendant pleaded guilty to distributing cocaine but during her plea colloquy refused to admit the quantity involved. Following a sentencing hearing where her codefendants testified about how much cocaine the defendant usually distributed each week, the district court found that she had distributed enough kilograms to mandate a minimum sentence of ten years. In making this finding, the court expressly considered the defendant's refusal to testify. Finding error, the Supreme Court concluded that "[b]y holding petitioner's silence against her in determining the facts of the offense at the sentencing hearing, the District Court imposed an impermissible burden on the exercise of the constitutional right against compelled self-incrimination." *Mitchell*, 526 U.S. at 330.

Importantly, *Mitchell* avoided the issue of whether a defendant's silence may be considered regarding a non-statutory aggravating factor of lack of remorse. The Court stated: "Whether silence bears upon the determination of a lack of

remorse . . . is a separate question. It is not before us, and we express no view on it." *Id.* Furthermore, our sister circuits are divided over whether the Fifth Amendment prohibits using silence to show lack of remorse inviting a harsher sentence. *Compare United States v. Mikos*, 539 F.3d 706, 718 (7th Cir. 2008) (holding that during a capital sentencing a defendant's silence may be considered regarding lack of remorse), *with Lesko v. Lehman*, 925 F.2d 1527, 1544-45 (3d Cir. 1991) (holding that during a capital sentencing a defendant's failure to apologize may not be considered regarding lack of remorse), *United States v. Roman*, 371 F. Supp. 2d 36, 50 (D.P.R. 2005) (holding that during a capital sentencing lack of remorse may not be proved using "information that has a substantial possibility of encroaching on the defendants' constitutional right to remain silent"), *and United States v. Cooper*, 91 F. Supp. 2d 90, 112-13 (D.D.C. 2000) (barring the inference of lack of remorse from a defendant's "unwillingness to acknowledge in his post-arrest statements that he is blameworthy for the crimes to which he admitted" (internal quotations omitted)). Despite *Mitchell* having reserved the question of whether silence bears upon lack of remorse, that decision may resolve the question we face today when read in conjunction with *Estelle*.[19]

---

[19]The government maintains that we should follow two Seventh Circuit decisions. In *Burr v. Pollard*, the court reasoned that "silence can be consistent not only with exercising one's constitutional right, but also with a lack of remorse . . . [which] is properly considered at sentencing because it speaks to traditional penological interests such as rehabilitation . . . and deterrence . . . ." 546 F.3d 828, 832 (7th Cir. 2008). This rationale overlooks the implications of remaining silent. Because remorse implies consciousness of guilt, speaking words of remorse for conduct prevents a defendant from later denying that conduct. Likewise, choosing to deny guilt prevents a defendant from speaking words of remorse for the charged offense. Exercising one's Fifth Amendment right to remain silent therefore entails failure to speak words of remorse. Accordingly, penalizing a capital defendant for failure to articulate remorse burdens his Fifth Amendment privilege against self-incrimination.

In *United States v. Mikos*, the court later reasoned that sentencing courts routinely consider silence in determining failure to accept responsibility

Sentencing involves findings about (1) circumstances of criminal conduct and (2) characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1) (requiring a sentencing court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant"); *Zant*, 462 U.S. at 879 (requiring that a selection decision during capital sentencing be "an individualized determination on the basis of the character of the individual and the circumstances of the crime" (emphasis omitted)). Following *Griffin* and its progeny, *Mitchell* held that a defendant's silence cannot be considered "in determining the facts of the offense at the sentencing hearing," 526 U.S. at 330, but the Court avoided mentioning whether silence could be considered regarding the defendant's character. For this reason, the government argues that *Mitchell* permits considering silence regarding the non-statutory aggravating factor of lack of remorse, which relates to character.

This argument, however, is in tension with *Estelle*. There, the Supreme Court found that the Fifth Amendment prohibited using a defendant's unwarned statements to prove the non-statutory aggravating factor of future dangerousness. *See Estelle*, 451 U.S. at 468. Future dangerousness and lack of remorse are similar factors that pertain to character rather than to circumstances of criminal conduct.[20] Accordingly, at least

---

under Section 3E1.1 of the United States Sentencing Guidelines, providing a sentencing discount for acceptance of responsibility. 539 F.3d at 718. But we previously held that withholding a sentencing discount under section 3E1.1, unlike a sentence enhancement, does not penalize the defendant for remaining silent. *See United States v. Gordon*, 895 F.2d 932, 936-37 (4th Cir. 1990) ("[F]or section 3E1.1 of the guidelines to apply, a defendant must first accept responsibility for all of his criminal conduct. . . . However, a defendant is not penalized for failing to accept responsibility. Rather, acceptance of responsibility is a mitigating factor available under appropriate circumstances." (citations omitted)).

[20]The government originally alleged lack of remorse as one of three considerations supporting the non-statutory aggravating factor of future dangerousness. The record does not make clear when lack of remorse became its own non-statutory aggravating factor, but the jury instruction treats them separately.

for the purpose of capital sentencing, *Estelle* belies any supposed distinction created by *Mitchell* between circumstances of criminal conduct and characteristics of the defendant. *See also Mitchell*, 526 U.S. at 340 (Scalia, J., dissenting) (finding "no logical basis for drawing such a line within the sentencing phase" (emphasis omitted)). *Estelle* might have been distinguishable as involving unwarned statements rather than silence, but *Mitchell* itself forecloses that argument. *See Mitchell*, 526 U.S. at 329 ("Although *Estelle* was a capital case, its reasoning applies with full force here, where the Government seeks to use petitioner's silence . . . ."). Thus, *Estelle* and *Mitchell* together suggest that the Fifth Amendment may well prohibit considering a defendant's silence regarding the non-statutory aggravating factor of lack of remorse.[21]

Although we recognize *Estelle* and *Mitchell*'s guidance, we ultimately find that any error would have been harmless. *See* 18 U.S.C. § 3595(c)(2) ("The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless."). Any prejudice Caro suffered was greatly mitigated by the district court's cautionary jury instruction. The court stated, "Remember that the defendant has a constitutional right to remain silent, and mere silence, alone, by the defendant should not be considered as proof of lack of remorse." J.A. 1449. This indicated that silence could never be considered regarding the non-statutory aggravating factor

---

[21]Furthermore, *Mitchell* reasoned that "[t]he Government retains the burden of proving facts relevant to the crime at the sentencing phase and cannot enlist the defendant in this process at the expense of the self-incrimination privilege." 526 U.S. at 330. This reasoning applies *a fortiori* to the non-statutory aggravating factor of lack of remorse. *See* 18 U.S.C. § 3593(c) ("The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt.").

of lack of remorse, and "we presume that a properly instructed jury has acted in a manner consistent with the instruction[ ]." *United States v. Alerre*, 430 F.3d 681, 692 (4th Cir. 2005); *see also Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (recognizing "the almost invariable assumption of the law that jurors follow their instructions").

Furthermore, Caro's affirmative conduct displaying lack of remorse was significant and telling. Just after killing Sandoval, Caro yelled, "Come get this piece of shit out of here." J.A. 676. When asked whether Sandoval was breathing, Caro replied: "No. At this time he's stinking up the room, get him out." J.A. 684. He also explained, "[Sandoval] called me a mother fucker, that whore, that's why I fucked him up." J.A. 781. And Caro boasted, "I killed a guy two weeks ago . . . [f]or being a fool." J.A. 790. In short, Caro exhibited lack of remorse quite clearly until deciding to plead not guilty and claim self-defense. Even without considering Caro's silence, the jury could not reasonably have reached another conclusion regarding lack of remorse.

## VII.    Mercy Instruction

Next we review the district court's failure to give Caro's proposed jury instruction about mercy. *See United States v. Caro*, 483 F. Supp. 2d 513, 517-18 (W.D. Va. 2007). "We review the district court's decision to give or refuse to give a jury instruction for abuse of discretion." *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009). "A district court commits reversible error in refusing to provide a proffered jury instruction only when the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *Id.* (internal quotation omitted). "Moreover, we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instruc-

tions accurately and fairly state the controlling law." *Id.* (internal quotations omitted).

A.

Caro requested the following jury instruction, indicating that mercy alone could justify a life sentence:

> [W]hatever findings you make with respect to the aggravating and mitigating factors, you are never required to impose a sentence of death. For example, there may be something about this case or about Carlos David Caro that one or more of you are not able to identify as a special mitigating factor, but that nevertheless creates a reasonable doubt about the need for Carlos David Caro's death. In such a case, the jury should render a decision against a death sentence. Moreover, even when a sentence of death is fully supported by the evidence, Congress has nevertheless given each of you the discretion to temper justice with mercy. Any one of you is free to decide that a death sentence should not be imposed in this case for any reason that you see fit. You will not have to explain the reason. Indeed, I am specifically required by law to advise you that you have this broad discretion.

J.A. 461.

The district court rejected Caro's proposal. It found the "proposed mercy instruction . . . improper because it would have told the jury that it could base its determination on factors not specified in the FDPA." *Caro*, 483 F. Supp. 2d at 517-18. The court explained that, although the jury could exercise mercy while weighing sentencing factors, it could not find a death sentence "justified" under 18 U.S.C. § 3591 and thereafter fail to recommend a death sentence. *Id.* at 518.

Instead of Caro's proposed instruction, the district court gave the following jury instruction:

> Whatever findings you make with respect to aggravating and mitigating factors, the result of the weighing process is never decided in advance. For that reason, a jury is never required to impose a sentence of death. At this last stage of your deliberation . . . it is up to you to decide whether, for any proper reason established by the evidence, you choose not to impose such a sentence on the defendant.

> What constitutes sufficient justification for [a] sentence of death in this case is exclusively left to you. Your role is to be the conscience of the community in making a moral judgment about the worth of an individual life balanced against the societal value of what the Government contends is deserved punishment for the defendant's offense. Whatever aggravating and mitigating factors are found, a jury is never required to conclude the weighing process in favor of a sentence of death, but your decision must be a reasoned one, free from the influence of passion, prejudice, or arbitrary consideration.

J.A. 1442-43, 1451.

## B.

Caro challenges the district court's failure to give his proposed mercy instruction. The issue turns on how the decision whether to select the death penalty rather than a life sentence should be made according to 18 U.S.C. §§ 3591 and 3593(e). Section 3591 provides that an eligible defendant "shall be sentenced to death if, after consideration of the factors set forth in section 3592 . . .[,] it is determined that imposition of a sentence of death is justified." 18 U.S.C. § 3591. Section 3593(e) elaborates as follows:

> [T]he jury . . . shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote . . . shall recommend whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence.

18 U.S.C. § 3593(e). Caro argues that § 3593(e)'s two-sentence structure creates a two-step process whereby (1) the death penalty might be found justified, with aggravating factors sufficiently outweighing mitigating factors, but (2) the jury might nonetheless impose a lesser sentence out of mercy. Conversely, the district court interpreted §§ 3591 and 3593(e) together to mean that, once the death penalty has been found justified because aggravating factors sufficiently outweigh mitigating factors, the death penalty must be imposed.

We find Caro's interpretation unpersuasive. First, the opening clause of § 3593(e)'s second sentence, namely, "Based on *this* consideration," refers back to the preceding sentence and thereby implies that when selecting a sentence the jury may consider only whether the death penalty is justified. 18 U.S.C. § 3593(e) (emphasis added). Second, § 3591 states plainly that an eligible defendant "shall be sentenced to death if . . . it is determined that imposition of a sentence of death is justified," 18 U.S.C. § 3591, and we are obliged to read §§ 3591 and 3593(e) in harmony, *see Smith v. United States*, 508 U.S. 223, 233 (1993) ("Just as a single word cannot be read in isolation, nor can a single provision of a statute."); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (noting "the cardinal rule that a statute is to be read as a whole since the meaning of statutory language, plain or not, depends on context" (citations omitted)). *See United States v. Allen*, 247 F.3d 741,

780-81 (8th Cir. 2001) (interpreting § 3593(e) the same way based on § 3591), *vacated on other grounds*, 536 U.S. 953 (2002). Because Caro's proposed instruction was legally incorrect, the district court's refusal to give that instruction was not an abuse of discretion.

## VIII.    Admissibility

Next we review decisions about whether to admit testimony offered under Federal Rule of Evidence 608(a), certain information about Sandoval, and Caro's offer to plead guilty. "We review evidentiary rulings of the district court for abuse of discretion." *Basham*, 561 F.3d at 325.

Decisions to admit or exclude information during an FDPA sentencing hearing are not governed by normal rules of evidence. Instead, the FDPA provides that a "defendant may present any information relevant to a mitigating factor" and that "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). We still review for abuse of discretion. *See United States v. Johnson*, 223 F.3d 665, 674 (7th Cir. 2000).

### A.

First we review the admission of certain testimony during Caro's murder trial. Sean Bullock occupied the cell directly across from Caro's cell when Sandoval was killed. During trial, Bullock testified about that event as follows: "Well, I'm standing in my door . . . and I seen out of my rear view someone like being choked. I looked . . . and I seen Caro standing behind the guy." J.A. 707. Bullock also noted seeing "an orange towel" around Sandoval's neck. J.A. 707. Finally, Bullock described several occasions where he assisted prison guards by providing information about other inmates. Cross-

examination showed that Bullock used aliases, had prior convictions, and testified with much greater detail than his earlier statements. In response, the government tried to rehabilitate Bullock by calling prison guard Gregory Bondurant. After explaining that Bullock had been a confidential informant, Bondurant testified: "In my opinion [Bullock] was truthful in the dealings he had with me." J.A. 779. Caro objected to Bondurant's testimony but never objected to Bullock's testimony.

Caro now challenges the district court's admission of Bondurant's testimony. Federal Rule of Evidence 608(a) provides:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked . . . .

Fed. R. Evid. 608(a). However, Rule 608(b) provides in part: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, . . . may not be proved by extrinsic evidence." Fed. R. Evid. 608(b).

Because Bullock's character for truthfulness was clearly attacked during cross-examination, no one contests that Bondurant's opinion testimony about Bullock's character was admissible under Rule 608(a). Caro asserts, however, that Bondurant's testimony that Bullock had been a confidential informant violated Rule 608(b). The district court did not abuse its discretion by rejecting this argument. Bondurant was allowed to provide a foundation for his opinion testimony by explaining his relationship with Bullock, *see United States v. Murray*, 103 F.3d 310, 322 (3d Cir. 1997) (holding that "testi-

mony that . . . Brown [had been] a confidential informant on 'numerous occasions' . . . was necessary to establish . . . a basis on which to offer . . . opinion as to Brown's character for truthfulness"), and Bondurant's statement that Bullock had been a confidential informant did nothing more.[22]

B.

We next review the exclusion of certain information about Sandoval. Caro has suggested that Sandoval might have targeted him and intentionally provoked a scuffle. Anticipating this argument, the government moved in limine to exclude evidence that Sandoval was placed in the SHU after being found carrying a shank. The district court denied the motion, reasoning that such evidence could be relevant to Sandoval's alleged "motive for being placed in the prison's Special Housing Unit where he would likely be celled together with [Caro]." J.A. 550. Notwithstanding, the court warned that Caro "might not be able to lay a proper foundation for the relevancy of this evidence." J.A. 550-51. Caro waited until the sentencing hearing to offer information about why Sandoval was placed in the SHU. The district court excluded this information, however, because Caro had laid no foundation for its relevance.

Because this decision was made during the sentencing hearing, we apply 18 U.S.C. § 3593(c) rather than normal rules of evidence. Although usually more generous than normal evidentiary rules, § 3593(c) likewise requires that information be relevant to some mitigating or aggravating factor. We agree that Caro never laid any foundation for his theory that Sandoval was following a plan to gain access to Caro. Caro points to nothing in the record to support this theory, and we could

---

[22]Caro argues that testimony giving details about Bullock's assistance to prison officials violated Rule 608(b). Such testimony, however, came not from Bondurant but from Bullock himself. And Caro never objected to Bullock's testimony.

find nothing. Moreover, the information offered does not appear relevant to any sentencing factor. We thus conclude that the district court's exclusion of that information was not an abuse of discretion.

## C.

Finally, we review the exclusion of Caro's offer to plead guilty. Hoping to rebut the alleged non-statutory factor of lack of remorse, Caro sought to present at sentencing a letter he had written to the government offering to plead guilty. Caro explained, "[W]e would like . . . for the jury to know that Mr. Caro was willing to accept responsibility for his conduct, and accept a life sentence." J.A. 1313. The government objected under Federal Rule of Evidence 410.[23] The district court then excluded the letter as irrelevant and "for the reasons stated by the Government." J.A. 1314.

Caro contends that the district court erred for two separate reasons. First, he argues that the letter was admissible under § 3593(c) because it supported the mitigating factor of acceptance of responsibility. *See* 18 U.S.C. § 3593(c) ("The defendant may present any information relevant to a mitigating factor."). He claims to have proceeded to trial only because the government rejected his offer. Second, Caro argues that his due process "right of fair rebuttal" required admitting the letter to rebut the alleged non-statutory aggravating factor of lack of remorse. *See Skipper v. South Carolina*, 476 U.S. 1, 5 n.1 (1986) ("Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty . . . the defendant [must] be afforded an opportunity to introduce evidence on this point . . . [given] the elemental

---

[23]Rule 410 provides that, with two exceptions, "any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn" is "not . . . admissible against the defendant who made the plea or was a participant in the plea discussions." Fed. R. Evid. 410(4).

due process requirement that a defendant not be sentenced to death on the basis of information which he had no opportunity to deny or explain." (internal quotations omitted)).

The government responds by arguing that a failed plea negotiation does not show acceptance of responsibility or rebut alleged lack of remorse. Caro's letter offering to plead guilty requested a promise not to seek the death penalty. Because Caro's letter was calculated to persuade the government not to seek the death penalty, rather than expressing unqualified remorse, we cannot agree with Caro's argument that the letter shows acceptance of responsibility. Therefore, we cannot say that the district court abused its discretion or violated due process by excluding it as irrelevant.[24] *See Owens v. Guida*, 549 F.3d 399, 420 (6th Cir. 2008) (indicating that a conditional plea offer does not show acceptance of responsibility).

## IX.    Cumulative Error

Finally, Caro argues that cumulative error warrants reversal. *See Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973) (finding that exclusion of critical evidence coupled with inability to cross-examine violated due process by denying a fair trial). "Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors

---

[24]In addition, Caro challenges the district court's denial of his motion for allocution (unsworn testimony without cross-examination) prior to sentencing. Caro moved for allocution under Federal Rule of Criminal Procedure 32, the Due Process Clause of the Fifth Amendment, and the Sixth Amendment. We have said that neither Rule 32 nor the Constitution provides a "right to make an unsworn statement of remorse before the jury which was not subject to cross examination" during a capital sentencing. *United States v. Barnette*, 211 F.3d 803, 820 (4th Cir. 2000). Accordingly, the decision of whether to allow the allocution fell within the district court's discretion. Because the court could reasonably have concluded that such information would be unduly prejudicial, confusing, or misleading under § 3593(c), we see no abuse of discretion.

has the potential to prejudice a defendant to the same extent as a single reversible error." *Basham*, 561 F.3d at 330 (internal quotations omitted). "To satisfy this requirement, such errors must so fatally infect the trial that they violated the trial's fundamental fairness." *Id.* (internal quotations omitted).

Although we recognized several possible errors, they were not widespread or prejudicial enough to have fatally infected Caro's trial or sentencing hearing. The proceeding below adhered to fundamental fairness. Each aggravating factor determined by the jury was well supported by the record. Finally, we cannot see how cumulative error could have caused the jury to weigh sentencing factors any differently.

For the reasons explained above, we

*AFFIRM*.

**Volume 2 of 2**

GREGORY, Circuit Judge, dissenting:

Today the majority blesses with constitutional imprimatur a death sentence that could only have been imposed after the jury found that Carlos Caro had previously been convicted of relatively minor, nonviolent drug offenses. If his sentence is ultimately carried out, Caro might well be the first, and as yet only, defendant executed after a jury found him death-eligible solely due to this type of nonviolent conduct. To reach this result, the majority applies the wrong test for deciding whether eligibility factors sufficiently narrow the class of defendants who can be executed and renders an important step in capital jurisprudence virtually useless. In doing so, my colleagues uphold statutory provisions that distinguish those who live from those who die in a wholly arbitrary and capricious way. I respectfully dissent.[1]

I.

At the outset, it is important to be clear about what conduct the eligibility factors in 18 U.S.C. §§ 3592(c)(10) and (12) cover and how those subsections apply to Caro. Subsection ten provides that a convicted murderer is eligible for death if that defendant "has previously been convicted of 2 or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance." § 3592(c)(10). Subsection twelve makes a convicted murderer death-eligible if "[t]he defendant had previously been convicted of violating title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of 5 or more years may be imposed." § 3592(c)(12). Titles II and III, as amended, prescribe five-or-more years in prison for, among other things, simple possession of "a mix-

---

[1]My dissent is limited to the judgment and the majority's holding in Part IV that the eligibility factors in this case pass Eighth Amendment scrutiny. I concur with the rest of the Court's analysis.

ture or substance which contains cocaine base," 21 U.S.C. § 844(a), and distribution of controlled substances, including possession with intent to distribute, § 841.

It is clear from the statute's structure that Congress intended to target relatively minor drug offenders for death-eligibility, and not simply the worst of the worst. Congress could have crafted eligibility factors that covered the worst offenders — those, for example, who operate through violence and intimidation, drug kingpins, and those who target children and schools — in fact, Congress did so in other parts of the FDPA. *See* 18 U.S.C. § 3591(b)(1) (authorizing death for a defendant who was part of a "continuing criminal enterprise" to distribute drugs), § 3591(b)(2) (authorizing death for the leader of a drug conspiracy who kills or attempts to kill a public officer, juror, or witness to further the conspiracy), § 3592(c)(13) (authorizing death for murder defendants who were part of a continuing enterprise to distribute drugs to minors). But in subsections ten and twelve, Congress opted to target offenders at the bottom of the drug-offender ladder: individuals convicted of crimes carrying prison sentences as low as one year; street-level distributors, drug mules, and even some possessors.

Caro was precisely this kind of low-level, nonviolent offender. He was a drug mule, recruited by his father and uncles at a young age to smuggle drugs across the border from Mexico, who in the process was twice convicted of possession with intent to distribute marijuana and once of possession with intent to distribute cocaine. Caro was by no means a high-ranking member of a drug conspiracy and by all accounts was never violent before going to prison. Under the FDPA, however, Caro's drug history is sufficient to make him eligible for death in the absence of any other aggravating factor relating to his character or crime. This is unacceptable under the Eighth Amendment and the majority is wrong to find otherwise.

## II.

The majority first errs by fundamentally misconstruing the nature and purpose of statutory eligibility factors in the death penalty schema. It claims that eligibility factors are constitutional so long as they do not apply to every murder defendant and so long as they are supported by some conceivable legislative goal. Maj. Op. at 26-28. By substituting rational basis review for the appropriate Eighth Amendment analysis, the majority glosses over the very serious way in which the eligibility factors challenged by Caro fail to narrow the class of death-eligible offenders in the way required by the Constitution.

Under the Eighth Amendment, only the government's interest in deterring and punishing violence implicates its interest in imposing the death penalty. Consequently, to perform their constitutionally required narrowing function, eligibility factors must limit the jury's focus to the defendant's violent conduct. Because the factors challenged here plainly do not do so, they cannot be the basis for Caro's death sentence.

### A.

By now it is axiomatic in capital jurisprudence that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980) (plurality) (quoting *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)). Statutory eligibility factors "play a constitutionally necessary function" in this process by "circumscrib[ing] the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 878 (1983).

In order for eligibility factors to serve this constitutional function, they must "adequately differentiate . . . in an objec-

tive, even-handed, and substantively rational way" those whom a jury may consider for death and those whom it may not. *Id.* at 879; *see Arave v. Creech*, 507 U.S. 463, 474 (1993) (aggravating factors must distinguish defendant sentenced to death from others convicted of murder in a "principled" way); *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (eligibility factors are "a means of genuinely narrowing the class of death-eligible persons"); *Godfrey*, 446 U.S. at 433 (invalidating death sentence based upon eligibility factor where "[t]here is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not").

The Supreme Court has helped illustrate the narrowing process, and statutory eligibility factors' role within it, by describing it as a pyramid. *See Zant*, 462 U.S. at 870-71; *Walton v. Arizona*, 497 U.S. 639, 716-18 (1990) (Stevens, J., dissenting). At the first point above the base of this pyramid lies the specific category of crimes for which the legislature, and subsequently the jury, may prescribe death. *Zant*, 462 U.S. at 871. As the law stands today, this category is limited to murder or other crimes that result in the death of the victim. *Kennedy v. Louisiana*, 128 S. Ct. 2641, 2665 (2008) ("Difficulties in administering the penalty to ensure against its arbitrary and capricious application require adherence to a rule reserving its use . . . for crimes that take the life of the victim."). At the pyramid's apex is the particular crime for which a jury ultimately sentences a defendant to die. *Zant*, 462 U.S. at 871. In order to move from the base to the apex, however, a defendant must pass through the eligibility plane.

In that eligibility plane, a jury must decide whether legislatively prescribed factors exist that separate murderers generally from death-eligible murderers. *Id.* Importantly, where a jury convicts a defendant of murder but does not convict him of special circumstances or aggravating factors in conjunction with that murder, then that defendant does not move from the base to the apex and therefore cannot be constitutionally exe-

cuted. *Id.* at 878 (aggravating factors, which move the defendant from the base to the second plane, are "constitutionally necessary"); *see Arave*, 507 U.S. at 474 (aggravating factors are constitutionally infirm if they apply "to *every* defendant eligible for the death penalty" (emphasis in original)).

### B.

Properly framed, the question raised by Caro's appeal is whether the two aggravating factors found by the jury are constitutionally sufficient to move him from the base to the apex, or whether the aggravators so fail to distinguish him from other defendants that they are not constitutionally significant. *See Zant*, 462 U.S. at 879. The factors here fail to sufficiently distinguish Caro from the general offender population because they do not involve violence.

A review of Supreme Court jurisprudence illustrates why only the nature or extent of a defendant's violent conduct can be a basis for moving him up the death penalty pyramid. We know, for instance, that because the death penalty is a punishment different in-kind in its severity and finality from other punishments, it is warranted only to the extent that it punishes conduct that is itself fundamentally distinct from other crimes — hence the aphorism "death is different." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Gregg*, 428 U.S. at 187 (joint opinion of Stewart, Powell, and Stevens, JJ.); *Furman v. Georgia*, 408 U.S. 238, 287-88 (Brennan, J., concurring), 306 (Stewart, J., concurring) (1972). How the death penalty is imposed must be tailored to the unique penological goals that justify the state's extraordinary power to take human life in the first instance.

When the state renounces a defendant's humanity by putting him to death, *Furman*, 408 U.S. at 306 (Stewart, J., concurring), it does so only to deter potential defendants from renouncing that humanity in others and to express appropriate moral outrage at the disrespect the condemned defendant has

shown towards human life by extinguishing it, *e.g.*, *Kennedy*, 128 S. Ct. at 2661-62; *Gregg*, 428 U.S. at 483 (joint opinion of Stewart, Powell, and Stevens, JJ.). Only violence — specifically that which results in another's death — implicates the state's interest in imposing capital punishment in the first instance. *Kennedy*, 128 S. Ct. at 2661-62. It follows that if the state's interest in imposing death is implicated initially by violence, then the constitutionally required narrowing function used to select the most deserving to receive that sentence must focus on the relative severity of that violent crime or past conduct. In other words, for the state's interest to be sufficient to impose death — to move from the base at which the interest is first implicated to the apex where the interest is sufficiently acute — the condemned's conduct must be sufficiently aggravated by concurrent or past violence. Eligibility factors must focus on this interest in order to narrow the jury's discretion in a genuine and "substantively rational way." *Zant*, 462 U.S. at 879.

This is clear when considering those aggravators that distinguish offenders by the nature of their specific offense, as opposed to the factors here that focus on the defendant's past conduct or behavior. The former must show that the defendant used violence in a particularly horrible way that is not typical even to murder. *See id.* at 877; *Godfrey*, 446 U.S. at 433. The resulting eligibility factors distinguish murderers based on whether their violent acts were committed for particularly abhorrent reasons, *e.g.*, § 3592(c)(8) (murder committed for pecuniary gain), whether those acts were committed in a particularly horrible way, *e.g.*, § 3592(c)(6) ("especially heinous, cruel, or depraved" conduct), § 3592(c)(5) (grave risk of danger to multiple victims), or whether those acts targeted individuals who deserve added protection from violence, *e.g.*, § 3592 (c)(11) (vulnerable victims), § 3592(c)(14)(D) (law enforcement officials and police officers). Each of these categories distinguish defendants on the basis of their violent conduct, and not external factors — like whether the defendant unrelatedly had a bag of cocaine in his car at the time of the

murder or whether the defendant was contemporaneously delinquent in filing his tax returns — that have no bearing on the defendant's culpability for capital punishment purposes.

The same logic applies to aggravators that distinguish death-eligible defendants based on their prior conduct. Prior-conduct eligibility factors must show that a murder defendant is more violent than other murder defendants in order to justify imposing death on that defendant. Otherwise, that eligibility cannot be said to distinguish defendants in a "substantively rational" way. *Zant*, 462 U.S. at 879.

This rule is most consistent with how the states and federal government generally use prior-conduct factors to distinguish defendants. The most common prior-conduct aggravators in death penalty statutes are prior convictions for murder or other violent felonies.[2] Indeed, the other aggravators in the FDPA that relate to a defendant's history and character all involve prior convictions for violent crimes. 18 U.S.C. § 3592(c)(2) (prior conviction for violent felony involving a firearm), (3) (prior conviction for crime that resulted in death of another person), (4) (prior conviction of serious offense resulting in death or serious bodily injury). Except when it comes to drug offenses, the states and federal government agree that prior, nonviolent conduct is insufficient to make a murder defendant death-eligible. It is this rule, not its exception embraced by the majority today, which comports with the Eighth Amendment.

## C.

Rather than revamp the entire capital-sentencing structure developed by the Supreme Court over the last four decades, I would find that Caro's death sentence violates the Eighth

---

[2]*See* The Death Penalty Information Center, *Aggravating Factors for Capital Punishment by State* (2009), http://www.deathpenaltyinfo.org/aggravating-factors-capital-punishment-state.

Amendment because the eligibility factors under which the jury sentenced him fail to narrow the class of offenders eligible for death in a "principled" or "substantively rational" way. *See Arave*, 507 U.S. at 474; *Zant*, 462 U.S. at 879. Caro was a low-level drug mule, convicted of possession with intent to distribute marijuana and cocaine. These convictions do not distinguish him from other murderers in a constitutionally-significant way because they do not implicate the state's qualitatively different interest in taking human life to deter future violence or impose retribution for escalating violence resulting in murder. *See Kennedy*, 128 S. Ct. at 2661-62; *Gregg*, 428 U.S. at 483 (joint opinion of Stewart, Powell, and Stevens, JJ.). The government's interest in punishing minor drug offenders is different in-kind from its interest in punishing the most violent and heinous murderers and therefore does not usefully distinguish Caro from other murderers. The same would be true were Caro or any other defendant made death-eligible for tax evasion, wire fraud, or driving while under the influence; none of this prior, nonviolent conduct would implicate the government's interest in the death penalty and therefore would not constitutionally narrow the class of death-eligible offenders.

The majority disagrees. Instead of holding that any eligibility factor relating to a defendant's history or prior conduct must involve violence, the majority subjects the factors at issue here to rational basis review. Maj. Op. at 26-28. But rational basis scrutiny has no bearing on whether or not a statutory provision complies with the Eighth Amendment. As the Supreme Court recently explained:

> [R]ational-basis scrutiny is a mode of analysis we have used when evaluating laws under constitutional commands that are themselves prohibitions on irrational laws. In those cases, "rational basis" is not just the standard of scrutiny, but the very substance of the constitutional guarantee. Obviously, the same test could not be used to evaluate the extent to which

a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms.

*District of Columbia v. Heller*, 128 S. Ct. 2783, 2818 n.27 (2008) (internal citations omitted). Rational basis, therefore, cannot be used to evaluate whether a statutory provision complies with the specific proscription against cruel and unusual punishment.[3]

In holding otherwise, the majority effectively avoids the Eighth Amendment problem by pretending that Eighth Amendment standards do not apply. Rather than require the government to show that the FDPA suitably narrows a jury's discretion in a way that advances capital punishment's legitimate goals, the majority demands that Caro rebut every rea-

---

[3]The majority apparently confuses the Eighth Amendment's requirement to review death sentences for arbitrariness with rational basis review. Maj. Op. at 28. This is a clear mistake.

Rational basis is a term of art; a method by which courts review almost all state action to ensure that there is at least some conceivable, non-discriminatory or rational purpose for that action. *See United States v. Carolene Products Co.*, 304 U.S. 144, 152-53 (1938). The Eighth Amendment's arbitrary-and-capricious review is quite different. When reviewing a death sentence under the Eighth Amendment, a court looks to whether the sentence was imposed under conditions that create a substantial risk that the decision to execute a defendant was reached arbitrarily and capriciously. *Gregg*, 428 U.S. at 189 (joint opinion of Stewart, Powell, and Stevens, JJ.). Essentially, rational basis review is the opposite of arbitrary-and-capricious review. The former assumes that the government is acting appropriately and will accept almost any explanation to support that assumption. *See Carolene Products*, 304 U.S. at 153. The latter places the burden on the state to show that where it decides to take a human being's life, it has reached that decision in the most scrupulous and principled way possible. *See Kennedy*, 128 S. Ct. at 2665 ("In most cases justice is not better served by terminating the life of the perpetrator rather than confining him"); *Gregg*, 428 U.S. at 189 (joint opinion of Stewart, Powell, and Stevens, JJ.).

son for these eligibility factors that is conceivably related to a legislative goal, no matter how attenuated from the limited interests that justify the state's executing a human being. The majority recognizes the Eighth Amendment requirement that eligibility factors genuinely and substantively narrow death-eligible defendants, but it robs this requirement of meaning by declaring that any factor is sufficient so long as there is some plausible legislative consideration behind it. This renders the Eighth Amendment rhetoric without content.[4]

In practice, the rule proposed by the majority today transforms the pyramid created by the Supreme Court into a rhombus, in which eligibility factors serve no narrowing function whatever. Though it concedes that the eligibility factors here do not involve violence, the majority insists that they survive its limited, deferential review because drug offenses are "associated with violence." Maj. Op. at 27. It is hardly clear what it means to be associated with violence, but whatever it does mean, the associated-with-violence test cannot be a genuinely narrowing construct in practice. Among the many factors considered by those in the psychiatric and public-health fields to be "associated with violence" are: fire-setting, truancy, family conflict, recent humiliation, history of bullying or being bul-

---

[4]The majority's unabashed embrace of this position is startling. It admits, as it must, that in order to comply with the Eighth Amendment, statutory aggravating factors must "genuinely narrow the class of persons eligible for the death penalty," but in the same paragraph chastises me for "presuppos[ing] that each statutory aggravating factor standing alone must narrow the class of persons eligible for the death penalty to include only those who deserve a death sentence." Maj. Op. at 28 n.16 (internal citations and quotation marks omitted). The logical inconsistency in this statement is obvious. If the Supreme Court says that aggravating factors must genuinely narrow the class of offenders eligible for the death penalty, it is hardly a great presupposition to conclude that the factors, themselves, must narrow in accordance with the Eighth Amendment. The majority can insist all it wants that the aggravating factors here "plainly" satisfy the ad hoc standard it invents today, but it cannot pretend that its standard is derived from the Eighth Amendment or flows from the decisions of the Supreme Court.

lied, poverty, unstructured time, and community disorganization.[5] How can the majority reasonably argue that any of the above factors could serve as statutory eligibility factors? If the majority admits, which it must, that eligibility factors must perform at least some narrowing function, surely its associated-with-violence test must fail.

Likewise, the majority claims that the eligibility factors before us today are justified by the government's interest in punishing recidivists. Who could doubt, the majority asks, that Congress could reasonably decide that repeat offenders deserve harsher treatment than first-timers? Maj. Op. at 27-28. This very question, though, conflates the government's general interest in deterring socially detrimental conduct with its interest in deterring death-eligible conduct. Recidivism in the abstract of course justifies escalating punishment. But the "death is different" principle underlying all capital jurisprudence illustrates that conduct must be different in kind, not just degree in order to trigger the government's interest in putting a defendant to death. *See, e.g.*, *Lockett*, 438 U.S. at 604. This is precisely why we are charged with analyzing death penalty claims under the Eighth Amendment and not generalized rational basis review. Nonviolent drug recidivists, like all other nonviolent, repeat offenders do not meet that Eighth Amendment criterion.

---

[5]New York State Office of Mental Health, V*iolence Prevention: Risk Factors*, http://www.omh.state.ny.us/omhweb/sv/risk.htm. *See* Erica Beecher-Monas & Edgar Garcia-Rill, *Danger at the Edge of Chaos: Predicting Violent Behavior in a Post-Daubert World*, 24 Cardozo L. Rev. 1845, 1867-68 (2003) (listing mental illness, family dysfunction, poverty, and living in high crime or urban areas as potential risk factors for violence and then explaining that the presence of a risk factor does little to predict whether or not an individual with that risk factor will actually be violent in the future).

### III.

Because the majority applies a test that in no way narrows the class of death-eligible offenders, the result is a sentence reached without properly distinguishing Caro from all other murderers. But of all the non-violent offenses the government could have chosen to distinguish death-eligible defendants, drug offenses create perhaps the greatest risk that a defendant will be executed arbitrarily.

### A.

It has long been settled that a death penalty provision that applies to a vast offender population but is applied inconsistently or sparingly violates the proscription against cruel and unusual punishment. *E.g.*, *Godfrey*, 446 U.S. at 433 (plurality); *Furman*, 408 U.S. at 249 (Douglas, J., concurring), 276 (Brennan, J., concurring), 309 (Stewart, J., concurring), 312 (White, J., concurring), 366 (Marshall, J., concurring). This is so largely because when the government selects so few offenders from such a large pool for execution, it cannot further its legitimate penological interests; instead it merely inflicts gratuitous pain and suffering. *See Gregg*, 428 U.S. at 183 (joint opinion of Stewart, Powell, and Stevens, JJ.); *see also Baze v. Rees*, 128 S. Ct. 1520, 1551 (2008) (Stevens, J., concurring).

According to a Department of Justice report, 54 percent of federal inmates in 2007 were in prison for nonviolent drug offenses[6] — by far the highest percentage of offenders in any category.[7] That same report also found that nearly 20 percent

---

[6]The Report does not explicitly state that the drug offenders are nonviolent; however, the report does distinguish miscellaneous, violent offenders from drug offenders and organizes the statistics by most serious offenses, illustrating that the drug offenders were very likely nonviolent.

[7]Heather C. West & William J. Sabol, *Prisoners in 2007* App. 12 (2008), *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/p07.pdf.

of inmates in state prison were also there for drug crimes,[8] of which 60 percent were low-level and nonviolent.[9]

Of all the nonviolent offenses Congress could have made death eligible, it is clear, then, that it targeted the class of offenses with the largest number of offenders. And when these reports are viewed in conjunction with the 8.6 million people who reported using crack cocaine as of 2007,[10] and the number of persons convicted of applicable drug offenses who are no longer in prison, the eligibility factors used to make Caro death-eligible potentially apply to several million people. This makes subsections ten and twelve functionally catchall provisions, which a prosecutor can choose to use or not use arbitrarily and in a way that leads to "standardless sentencing discretion." *See Godfrey*, 446 U.S. at 428 (internal quotation marks and alterations omitted).

Even if they could theoretically be applied reasonably, courts and juries use the factors so rarely that they gravely risk doing so arbitrarily in practice. The government cites to one case in which an appellate court previously upheld a death sentence under subsection (c)(10). *See United States v. Bolden*, 545 F.3d 609, 617 (8th Cir. 2008). I am aware of only one other case in which a defendant was sentenced to die after a jury found him death-eligible under the provisions challenged by Caro. *See United States v. Higgs*, 353 F.3d 281, 295 (4th Cir. 2003). In both *Bolden* and *Higgs*, however, the jury also found that the defendants were eligible under other provisions, and not just because of prior nonviolent drug offenses.

---

[8]*Id.* at App. 11.

[9]Marc Mauer & Ryan S. King, *A 25 Year Quagmire: The War on Drugs and its Impact on American Society* 2 (2007), *available at* http://www.sentencingproject.org/doc/publications/dp_25yearquagmire.pdf.

[10]National Institute of Drug Abuse, *NIDA InfoFacts: Crack and Cocaine* 4 (2009), http://www.drugabuse.gov/pdf/infofacts/ Cocaine09.pdf.

That, to the best of my knowledge, makes Caro the only defendant who was deemed death eligible *only* under one or both of these FDPA provisions.

The result is the same when considering any analogous state law provisions. By my count, only two states, Louisiana and New Hampshire, have provisions that arguably apply as broadly as the FDPA's;[11] yet I am aware of no case in which either of those states' courts considered a death sentence for an offender who was selected for death eligibility because of a prior nonviolent drug conviction.

The government, therefore, cannot claim that executing Caro will further its legitimate interests in deterrence or retribution. *See Kennedy*, 128 S. Ct. at 2649-50. Low-level drug offenders are so rarely selected for death and ultimately executed for their prior offenses alone that the FDPA cannot be said to deter them from murder. *See Furman*, 408 U.S. at 311 (White, J., concurring). Likewise, murderers are so infrequently and inconsistently selected to die on the bases asserted here that it is "very doubtful that any existing general need for retribution would be measurably satisfied" by Caro's execution. *Id.* Executing Caro would therefore be "the pointless and needless execution of life with only marginal contributions to any discernible social or public purposes." *Id.* It

---

[11]N. H. Rev. Stat. Ann. § 630:1 (2009); La. Code Crim. Proc. Ann. art. 905.4(A)(11) (2009). The one case of which I am aware in which the Louisiana Supreme Court interpreted its provision, it did so only in the context of a capital defendant who killed during the course of a drug deal and not a defendant who was made death-eligible for a past offense. *See Louisiana v. Neal*, 796 So. 2d 649, 661 (La. 2001).

Furthermore, Florida authorizes a defendant's prior drug conviction, carrying a sentence of more than one year, to be used as a statutory aggravator, but only if the defendant's underlying capital conviction was for drug trafficking. Fla. Stat. Ann. § 921.142(6)(b) (LexisNexis 2009). This provision is almost surely unconstitutional in light of the Supreme Court's decision in *Kennedy*. *See* 128 S. Ct. at 2665.

would consequently be irreconcilable with the Eighth Amendment.

### B.

The inherent arbitrariness in subsections ten and twelve is exacerbated by the way in which they can work to prevent a jury from giving meaningful consideration to relevant, mitigating evidence. Our justice system, reflecting broader concerns of society at-large, takes an often ambivalent view of minor drug offenders; one that recognizes their criminality but simultaneously accepts their own victimhood. Because drug offenses can so often be part-and-parcel of otherwise mitigating circumstances, making these offenses eligibility factors limits a defendant's ability to present mitigating evidence and increases the likelihood of an arbitrary sentence.

Not only must a capital defendant be allowed to present mitigating evidence at his sentencing, but the jury must be able to give meaningful effect to that evidence. *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 262 (2007); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *overruled on other grounds*, *Atkins v. Virginia*, 536 U.S. 304 (2002). Courts must closely scrutinize evidence that can be used as a "two-edged sword" against a capital defendant, i.e., mitigating evidence that a jury might also consider aggravating, to ensure that juries can give appropriately mitigating weight to that evidence. *Abdul-Kabir*, 550 U.S. at 255; *Roper v. Simmons*, 543 U.S. 551, 573 (2005) (abolishing death penalty for juveniles, in part because juries might inappropriately consider youth an aggravating, rather than a mitigating factor); *Atkins*, 536 U.S. at 320 (creating a bright-line rule barring execution of mentally retarded, in part because of the risk that juries would consider evidence of mental retardation aggravating, not mitigating).

A defendant's history of drug abuse is classic mitigating evidence, which the Supreme Court has held a jury must be able to consider and give effect to when sentencing a defen-

dant. *E.g.*, *Cone v. Bell*, 129 S. Ct. 1769, 1784 (2009). Likewise, evidence that a defendant was induced into criminal behavior at a young age by close relatives is precisely the type of "troubled childhood" evidence to which jurors must be allowed to give meaningful, mitigating effect. *See Abdul-Kabir*, 550 U.S. at 262. Indeed, the FDPA itself acknowledges specifically that juveniles induced into drug trafficking by adults are victims who are presumably less blameworthy for their conduct. *See* § 3592(d)(7) (making it an aggravating factor to use minors in drug trafficking).

Jurors in Caro's case could not be expected to give meaningful effect to Caro's drug use and troubled background because they were forced to consider both as the reasons he should be death-eligible in the first place. The record reveals that Caro was a cocaine addict[12] and that he dropped out of school to become a drug mule at his father and uncles' behest. Caro's attorneys were therefore faced with a modern Sophie's Choice: either forcefully present this evidence, thereby emphasizing to the jurors the basis for which they selected Caro for death-eligibility, or hardly mention the evidence at all to avoid further aggravating Caro's crime in the jurors' eyes.

It is rare, indeed, that an attorney's decision not to present or emphasize mitigating evidence can truly be characterized as a strategic choice. But here it is not surprising that Caro's lawyers opted to focus on Caro's future dangerousness to the jury, rather than his drug addiction or his early introduction to drug smuggling by his father and uncles. Even if his lawyers had emphasized it, at best, the jury could not be expected to give any meaningful effect to the same evidence that aggravated Caro's crime to death-eligible murder. At worst the evidence would have only reinforced their initial finding that Caro was worthy of the ultimate punishment. Caro's sentence

---

[12]It does not appear in the record whether Caro was addicted to cocaine powder or cocaine base.

quite possibly was "imposed in spite of factors which may [have] call[ed] for a less severe penalty," *Lockett*, 438 U.S. at 605, because the FDPA prevented the jury from considering relevant, mitigating evidence. The risk that the resulting sentence was imposed arbitrarily "is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Id.*

IV.

Today's decision comes on the heels of an interesting report regarding the state of capital punishment in this country, and particularly in our circuit. According to the report, the number of death sentences handed down nationally over the past year has decreased to the lowest level since the Supreme Court reinstated capital punishment in 1976.[13] This is particularly true in Virginia, which traditionally uses the death penalty more than all-but-one other state in the union.[14]

Among the reasons suggested for this phenomenon are the response to recent Supreme Court decisions prohibiting executions for certain offender classes, jurors' concerns about executing innocent people, and legislative and prosecutorial concerns about overusing the death penalty in the current economic climate.[15] Ironically, one of the reasons given for the reduction of death sentences in Virginia is that prosecutors are increasingly not seeking death for drug-related murders — apparently because they do not view these offenders as the worst of the worst.[16] This reduction in prosecutors' pursuing death sentences and juries' imposing them has not correlated

---

[13]Robert Barnes & Maria Glod, *Number of Death Sentences Falls to a Historic Low*, Wash. Post, Dec. 18, 2009, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/12/17/AR2009121704299.html.

[14]*Id.*

[15]*Id.*

[16]*Id.*

with a similar reduction in executions, nor has it hampered the states' ability to execute the most heinous offenders.[17]

All of which suggests that the decades-long dialogue between courts and the political branches about capital punishment is finally starting to achieve a constitutionally-necessary equilibrium; one that accommodates the government's interest in punishing murderers and the Constitution's command that the government not do so arbitrarily. As the judiciary has tried to implement the Eighth Amendment's proscription against cruel and unusual punishment by requiring that death sentences be imposed only after a process that selects, in a non-arbitrary way, the worst-of-the-worst offenders, the political branches have responded by recalibrating their notion of which offenders are death eligible and proceeding accordingly. The apparent upshot is that those charged with the awesome power of seeking and imposing death have sought to limit that power to those most deserving, and in so doing, have made the death penalty more effective and efficient, even as they have limited the class of offenders to whom it may be applied.[18]

This decision threatens to undermine that constitutionally necessary equilibrium. Carlos Caro's death sentence was imposed because he had previously committed relatively minor, nonviolent drug crimes. Of all similarly situated defendants, it appears that only Caro now faces the prospect of

---

[17]*See id.*

[18]Despite the dramatic reduction in death sentences in Virginia, the last person executed in the Commonwealth was put to death within six years of his sentence and conviction. Josh White & Maria Glod, *Muhammad Executed for Sniper Killing*, Wash. Post, Nov. 11, 2009, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/11/10/AR2009111001396.html. Conversely, since the Supreme Court reinstated capital punishment, the average condemned inmate has spent over a decade on death row before the sentence has been implemented. *See* The Death Penalty Information Center, *Time on Death Row*, http://www.deathpenaltyinfo.org/time-death-row.

being executed after being chosen because of factors so completely divorced from the state's legitimate penological interests in taking human life. Whatever Caro's prior conduct says about his character, under the Eighth Amendment, it cannot serve as the sole reason for his death eligibility as compared to other defendants. Even the government's attorney had to allow at oral argument that Caro's sentence seemed "anachronistic" in light of evolving death penalty jurisprudence. Yet the majority disagrees.

Justice Stewart spoke in *Furman* of the way in which some "death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual." 408 U.S. at 309 (Stewart, J., concurring). Thirty-eight years later, I can think of no more apt way to describe Caro's sentence. The FDPA provisions that prescribe such a random and unprincipled sentence do not withstand Eighth Amendment scrutiny. Had the majority applied that level of scrutiny, I have little doubt that it would have reached the same conclusion. I respectfully dissent.